A05A1108. JAMES v. THE STATE.
(618 SE2d 133)

BLACKBURN, Presiding Judge.

Following her conviction of concealment of a death[1] and theft by taking,[2] Jayna Denise James appeals, contending that the trial court erred in denying her motion for directed verdict of acquittal, and in admitting into evidence photographs of the victim's decomposed body. For the reasons which follow, we affirm.

1. James maintains that the trial court erred in denying her motion for directed verdict of acquittal because the evidence was insufficient to support her convictions.

> The standard of review for the denial of a motion for a directed verdict of acquittal is the same as that for determining the sufficiency of the evidence to support a conviction. On appeal, we view the evidence in the light most favorable to the jury's verdict, and the defendant no longer enjoys the presumption of innocence. This Court does not weigh the evidence or determine witness credibility, but only determines if the evidence was sufficient for a rational trier of fact to find [James] guilty of the charged offense beyond a reasonable doubt. *Jackson v. Virginia.*[3]

(Citation omitted.) *Lanier v. State.*[4]

Viewed in a light most favorable to the jury's verdict, the evidence shows that David Nemeth disappeared in January 1999. At that time, he was living with, and engaged to be married to, James. James had a home in Bibb County and operated a hair salon in Peach County. Around Thanksgiving, in 1998, James told Michael Graham, one of her customers who also did yard work for her, that she and Nemeth were not getting along, that she wanted Nemeth out of her house, but that Nemeth would not leave. On January 10, 1999, Graham talked to James at her salon and indicated that he was going

---

[1] OCGA § 16-10-31.
[2] OCGA § 16-8-2.
[3] *Jackson v. Virginia,* 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).
[4] *Lanier v. State,* 269 Ga. App. 284, 285 (1) (603 SE2d 772) (2004).

to her house to pick up a lawn mower he had left there. James asked Graham to speak to Nemeth about leaving; she also asked him to retrieve a necklace she had given to Nemeth.

Graham testified that when he got to James's house, he talked with Nemeth and that the conversation soon turned into a fight. Nemeth struck Graham and knocked him to the floor; Graham got to his feet and, in the act of chambering a round in a pistol which he had brought with him, shot and killed Nemeth.

Shortly thereafter, James arrived at the house. Graham told her that Nemeth was dead and suggested that they call the police. James, however, told Graham that they could not call the police because her family did not know that Nemeth was living there; instead, she told Graham that Nemeth's body had to be moved. When he asked her what to do, she said, "I don't care what you do. Put him in the dumpster, anything, get him out of my house." When Graham told her there was a small spot of blood, she gave him a bottle of 409 and a roll of paper towels and said, "Well, clean that up. You're going to have to get him out of the house."

Graham put Nemeth's body into his truck and drove to Dodge County, where he buried Nemeth on land owned by his father. A few days later, Graham returned to James's house and gave her Nemeth's necklace. At this time, James told Graham, "It's okay. I'll say that I got home — I'll say that Saturday afternoon we got in a fight, I left; I came home Saturday night and he was gone. I don't know what happened to him. He didn't use my cell phone on Sunday. He was home alone all day Sunday. So nobody knows." Not long afterward, James gave Graham a sports memorabilia collection that had belonged to Nemeth.

Christine Oda, Nemeth's sister, became concerned when Nemeth failed to return any of her calls for a week. Oda called James to ask about her brother, but James told her that he had moved out and taken only the personal possessions he could fit into his car, including his sports memorabilia collection. After speaking with James, Oda called the police and reported Nemeth missing. A Warner Robins police officer contacted James on January 17, 1999, and inquired about Nemeth; James told the officer that Nemeth had left while she was at work on January 10, and that she had not seen him since.

Nemeth's parents also called James after speaking with Oda. James told them that Nemeth had left and that she was keeping his bed as collateral for a debt he owed her. She informed them that she had sent them a letter in which she explained to them that she and Nemeth had ended their relationship; she also had written that she had not heard from Nemeth since January 10, saying, "I just wish I could help you find David, but I don't have a clue where he could be."

The Warner Robins police forwarded the missing person file on Nemeth to the Bibb County sheriff's office, and an officer with that office talked with James at her hair salon. James told the officer that she and Nemeth had been engaged, that they had broken up, and that he had left.

James married James Suddeth on March 10, 1999. Suddeth testified at trial that, while he and James were married, James told him that a camera and a bed she had at her home belonged to Nemeth.

Graham periodically purchased marijuana from Edison Brack, a longtime friend. At some point in time, Graham went to Brack for marijuana and asked him to take some collectible baseball cards as payment for the marijuana. When Brack asked Graham where he got the cards, Graham told him that they had belonged to the boyfriend of the woman who cut his hair; when Brack asked what he would do if the boyfriend came back for the cards, Graham said, "He's not coming back. I killed him."

Brack went to the police, and Graham became a suspect in the case. Graham was arrested and confessed to killing Nemeth on July 1, 2003. The next day, he took police officers to Nemeth's body.

OCGA § 16-10-31 provides that a "person who, by concealing the death of any other person, hinders a discovery of whether or not such person was unlawfully killed is guilty of a felony." Based on the evidence, the jury was authorized to conclude that James effectively hindered the discovery of Nemeth's body for over three years and, thus, to find James guilty of concealing Nemeth's death.

Under OCGA § 16-8-2, a "person commits the offense of theft by taking when he unlawfully takes or, being in lawful possession thereof, unlawfully appropriates any property of another with the intention of depriving him of the property, regardless of the manner in which the property is taken or appropriated." The evidence was sufficient to authorize the jury to find James guilty of the theft by taking of Nemeth's sports memorabilia collection and his camera.

2. James also argues that the trial court erred in denying her motion for directed verdict of acquittal as to the crime of concealment of death on the grounds of improper venue. Specifically, James maintains that venue was improper in Bibb County because there was no evidence that she aided Graham in the removal of Nemeth's body from her house and because all of the interviews she had with law enforcement officers took place at her hair salon in Peach County. There is no merit to this argument.

> Generally, a criminal action must be tried in the county in which the crime was committed, and the State may establish venue by whatever means of proof are available to

it, including direct and circumstantial evidence. As an appellate court, we view the evidence in a light most favorable to support the verdict and determine whether the evidence was sufficient to permit a rational trier of fact to find beyond a reasonable doubt that the crime was committed in the county where the defendant was indicted.

*Pippins v. State.*[5]

There was uncontroverted testimony that Graham informed James of Nemeth's death when she returned to her Bibb County home and that, after being informed of Nemeth's death, James instructed Graham to get rid of the body and provided him with cleaning materials to clean up blood. James knew that the Bibb County sheriff's office was conducting a missing person investigation on Nemeth, yet James never called the sheriff's office to report either Nemeth's death or Graham's involvement in his death. We conclude that the State met its burden of proving beyond a reasonable doubt that venue for the crime of concealing the death of another was properly in Bibb County.

3. James next asserts that the trial court erred in denying her motion for directed verdict of acquittal as to concealment of death because there was a fatal variance between the allegations in the indictment and the proof offered at trial. James notes that Count 1 of the indictment charges her with concealment of Nemeth's death in that she "did aid Michael Graham in the removal of the deceased from her residence and did deny knowledge of David Nemeth's death when questioned by law enforcement," but that there was no evidence presented at trial that she assisted Graham in the removal of the body. There is no merit to this assertion.

Our courts no longer employ an overly technical application of the fatal variance rule, focusing instead on materiality. The true inquiry, therefore, is not whether there has been a variance in proof, but whether there has been such a variance as to affect the substantial rights of the accused. It is the underlying reasons for the rule which must be served: 1) the allegations must definitely inform the accused as to the charges against him so as to enable him to present his defense and not to be taken by surprise, and 2) the allegations must be adequate to protect the accused against another prosecution for the same offense. Only if the allegations fail to meet these tests is the variance fatal.

---

[5] *Pippins v. State*, 263 Ga. App. 453, 455 (2) (588 SE2d 278) (2003).

*Pippins*, supra at 456 (3). The language of the indictment, as set forth above, sufficiently apprised James of the charge against her, and did not mislead or prejudice her as to the criminal act with which she was charged. Id.

4. Pointing out that Nemeth disappeared in January 1999, and that she was not indicted until February 17, 2004, James next contends that the trial court erred in denying her motion for directed verdict of acquittal because the four-year statute of limitation set forth in OCGA § 17-3-1 had expired at the time of the indictment. We disagree.

Under OCGA § 17-3-2 (2), the period within which a prosecution must be commenced "does not include any period in which . . . [t]he person committing the crime is unknown or the crime is unknown." In this case, as to the crime of concealing the death of another, testimony established that law enforcement officers did not know that Nemeth was dead until Graham confessed to killing him and took them to his grave in July 2003. Thus, they did not know that a death had been concealed until July 2003, and the statute of limitation as to that crime did not begin to run until that time. As to the crime of theft by taking, law enforcement officers did not know that Nemeth's sports memorabilia had been taken until Brack contacted them in October 2000. Only at that time was there reason to believe that the collection had been taken, and it was at that time that the statute of limitation began to run on the crime of theft by taking. Accordingly, under OCGA § 17-3-2, as to both crimes of which James was convicted, the statute of limitation had not expired at the time of the indictment and the trial court did not err in denying her motion for directed verdict of acquittal on that ground.

5. James also maintains that the trial court erred in denying her demurrers and motion for directed verdict of acquittal as to the count of theft by taking. James notes that the indictment charges her with taking possession of the sports memorabilia collection and camera on or about January 27, 1999. She argues that, since Nemeth had, by that date, been dead for two weeks, and since a dead person cannot own property, the State failed to identify any owner or lawful custodian of the sports memorabilia collection and the camera as of the date of the theft and, thus, the indictment was fatally defective. This argument is meritless.

First, as one treatise explains,

[a]lthough, as an abstract principle of law, one ordinarily cannot be guilty of robbery if the victim is a deceased person, this principle does not apply where a robbery and homicide are a part of the same transaction and are so interwoven with each other as to be inseparable. If the taking was made

possible by an antecedent assault, the offense is robbery regardless of whether the victim died before or after the taking of the property.[6]

Common sense demands that this be so, else one could avoid a charge of armed robbery by killing one's victim before taking his property.

Second, there simply was no fatal variance between the indictment and the evidence presented at trial in this case. As we observed in Division 3, the courts no longer employ an overly technical application of the fatal variance rule and focus, not on whether there has been a variance in proof, but on whether there has been such a variance as to affect the substantial rights of the accused. The allegations must (1) definitely inform the accused as to the charges against him so as to enable him to present his defense and not to be taken by surprise, and (2) be adequate to protect the accused against another prosecution for the same offense. Only if the allegations fail to meet these tests is the variance fatal. *Pippins*, supra at 456.

The indictment charged that James took "possession of a sports card collection, sports memorabilia, and a 35 mm camera, valued in excess of $500.00, property of David Nemeth." This language sufficiently apprised James of the charge against her, and did not mislead or prejudice her as to the criminal act with which she was charged. Id.

6. James argues that the trial court erred in admitting into evidence photographs of Nemeth's severely decomposed body, of the burial site, and of the excavation of the body. "The admission of photographs into evidence is a matter within the discretion of the trial court. Unless the potential for prejudice in the admission of evidence substantially outweighs its probative value, the Georgia rule favors the admission of any relevant evidence, no matter how slight its probative value." (Punctuation omitted.) *Williams v. State.*[7]

James contends that the probative value of the gruesome photographs was substantially outweighed by their prejudicial effect, and that they were not relevant to the State's case for concealment of death because they did not prove any element of the State's case and because she had stipulated to Nemeth's death and the manner in which he was killed.

> Photographs which demonstrate the location of the body, the location and nature of wounds to the victim, and the crime scene, are relevant and material to the issue of death, as well as to the issue of concealing a death, and

---

[6] 77 CJS, Property, § 9.
[7] *Williams v. State*, 269 Ga. App. 512, 513 (2) (604 SE2d 592) (2004).

photographs which are material and relevant to any issue are admissible even though they may be duplicative and inflame the jury.

(Citations omitted.) *Burgan v. State.*[8] "Moreover, photographs which are material and relevant are not excludable on the ground that the defendant has stipulated to the cause of death." *Jones v. State.*[9] We find no abuse of discretion in their admission.

7. Any remaining enumerations of error are patently without merit.

*Judgment affirmed. Miller and Bernes, JJ., concur.*

DECIDED JULY 15, 2005 — ▮▮▮▮▮▮▮▮

*Clarke, Moore & Hall, Michael J. Moore, Walker, Hulbert, Gray, Byrd & Christy, Charles W. Byrd*, for appellant.

*Howard Z. Simms, District Attorney, Elizabeth K. Bobbitt, Sandra G. Matson, Assistant District Attorneys*, for appellee.

---

[8] *Burgan v. State*, 258 Ga. 512, 514 (3) (371 SE2d 854) (1988).
[9] *Jones v. State*, 253 Ga. 640, 643 (5) (322 SE2d 877) (1984).