This decision was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Please also note that this electronic decision may contain computer-generated errors or other deviations from the official paper version filed by the Supreme Court and does not include the filing date.

# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Opinion Number:_____**

**Filing Date: March 28, 2013**

**NO. 32,506**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**BRANDON BARELA,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF CURRY COUNTY**
Stephen K. Quinn, District Judge

Robert E. Tangora, L.L.C.
Robert E. Tangora
Santa Fe, NM

for Appellant

Gary K. King, Attorney General
Yvonne Marie Chicoine, Assistant Attorney General
Santa Fe, NM

for Appellee

# DECISION

**MAES, Chief Justice.**

{1}    Brandon Barela (Defendant) was convicted of first-degree willful and deliberate murder, kidnapping, armed robbery, and two counts of tampering with evidence. Defendant was sentenced to a term of life imprisonment for first-degree murder and eighteen years for kidnapping, to be served consecutively. Defendant was also sentenced to nine-years for armed robbery and two three-year sentences for tampering with evidence to run concurrently with his eighteen year sentence for kidnapping. Defendant appeals his conviction directly to this Court. This Court exercises appellate jurisdiction where life imprisonment has been imposed. *See* N.M. Const. art. VI, § 2; *see also* Rule 12-102(A)(1) NMRA (providing a right to direct appeal when a sentence of life imprisonment has been imposed).

{2}    Defendant raises the following issues on appeal: (1) Whether the district court erred in granting the State's *Batson* challenge and denying Defendant the right to exercise a peremptory challenge excluding Dr. Kathryn Winters from the jury; (2) Whether the district court violated Defendant's right to confrontation by allowing the State's fingerprint expert to testify about tests which she neither performed nor supervised; (3) Whether the district court erred in denying Defendant's request for a mistrial; (4) Whether the district court improperly instructed the jury on the elements

of willful and deliberate murder; (5) Whether the district court erred by denying Defendant's motions for continuances; (6) Whether the district court erred in allowing the State to present a "non-crime" scene photo of Victim during its opening statements; (7) Whether there was sufficient evidence to support Defendant's convictions; (8) Whether the district court erred in allowing Defendant's custodial statements to be introduced into evidence without Defendant having been advised of his *Miranda* rights; (9) Whether, taken together as a whole, the district court's errors amounted to cumulative error.

## I.    FACTS AND PROCEDURAL HISTORY

{3}    Defendant, a supervisor with Double K Testing, and three company employees, Manual Vargas (Vargas), Jose Rodriguez (Rodriguez), and Lazaro Soto (Soto), traveled in a company truck from Roswell to Clovis to test milk at three local dairies. After finishing their work for the day, the men had dinner at a local Pizza Hut where they shared four pitchers of beer before heading back to their hotel.

{4}    After dinner, and before checking into their hotel, the men stopped and purchased beer from a gas station. After the men checked into their hotel, Defendant, Vargas and Soto went to Webb's Watering Hole (Webb's) to drink and play pool. While playing pool at Webb's the three men met Ron Hittson (Victim). The four men

played pool together until closing time at which point Defendant suggested that the men go to another bar to continue drinking. Soto did not want to go to another bar and had the other men take him back to the hotel. After dropping Soto off at the hotel, Vargas drove Defendant and Victim to City Limits Bar where the three men continued to drink and play pool. At the bar Defendant and Victim smoked marijuana in the restroom. When Victim and Defendant returned to the pool tables, the bar owner asked the three men to leave the bar.

{5}    The three men left the City Limits Bar and got back in the company truck to take Victim back to Webb's to get his vehicle. While in the truck on the way back to Webb's, Victim told Defendant and Vargas that he wanted to keep partying and inquired as to whether the other men knew where he could get some marijuana and cocaine. Defendant asked Victim if he had any money, and Victim showed Defendant that he had approximately $400 in cash.

{6}    Defendant then pulled out his cell phone, pretended to place a few calls looking for drugs, and drove in the direction of the dairies. Vargas sensed something was amiss and told Defendant he wanted to call it a night. Defendant said "no" and told Vargas that he wanted to "score some." Defendant again pretended to place calls looking for drugs and quoted Victim a price for "the score." Victim complained that

3

the price was too high and Defendant became aggravated.

{7}      Defendant and Victim exchanged words, and Victim told Defendant to stop the truck, and that he would walk back to "his rig." When Defendant stopped the truck, Victim exited and began walking towards town.

{8}      As Victim walked away from the truck, Defendant told Vargas "let's get him . . . I'm gonna get him." Defendant then jumped out of the truck, told Vargas to slide over to the driver's seat, grabbed something from the back of the truck, and proceeded in Victim's direction. Vargas moved to the driver's seat of the truck, rolled the window down, and drove in the direction of Victim and Defendant. Vargas heard the sound of someone "taking a hit," stopped the car, and walked toward Defendant and Victim. Vargas witnessed Defendant hit Victim over the head approximately four times with a cinder block.

{9}      When Vargas tried to stop Defendant, Defendant turned, hit Vargas in the face, and told him that he knew what he was doing, "[i]t's not like [he'd] never done this before, [and that he] need[ed] to do it." Vargas then went back to the truck. Defendant followed, tossed the cinderblock in the back, jumped in the passenger side of the truck, and instructed Vargas to take off.

{10}      When Vargas and Defendant arrived back at the hotel Defendant ran to Vargas

4

and Rodriguez's hotel room, woke Rodriguez up, and told him he needed help getting rid of a body. Vargas told Rodriguez what happened, and Rodriguez told him that he did not want anything to do with the situation.

{11} Defendant then went to his hotel room, woke Soto up, and told him he needed help. After talking with Soto, Defendant called another Double K employee, A.J. Perales (Perales), and asked him to drive Defendant's personal vehicle to Clovis. Defendant returned to Vargas and Rodriguez's room holding a crowbar and told Vargas that they needed to go back and make sure that Victim was dead. Vargas and Defendant drove back to the location where they had left Victim. Vargas dropped Defendant off near the location where they had left Victim's body. Vargas then drove down the road a bit further, did a u-turn, and returned to the spot where he had dropped Defendant off. Defendant jumped into the truck, tossed a crowbar onto the middle of the front seat and told Vargas to clean the crowbar off and put it back where it belonged. The two men then returned to the hotel for the night.

{12} The next morning Defendant drove Vargas, Soto, and Rodriguez to the job site. Perales arrived at the job site with Defendant's personal truck, and Defendant made up an excuse to leave early and left Clovis with Soto. After the others had completed the day's work, Vargas drove everyone back to Roswell in the company truck,

dropped everyone off at their respective homes, and drove the company truck to Defendant's house.

**{13}** Victim's body was found without any identification and his injuries rendered him unrecognizable. Police found Victim's truck in the parking lot of Webb's and based on Webb's surveillance video were able to connect Defendant, Soto, and Vargas to the Victim.

**{14}** Victim suffered a minimum of four "high energy injuries" to his head and face and a postmortem injury to his chest. Victim's body had no defensive wounds.

**{15}** Defendant was charged with first-degree murder contrary to NMSA 1978, Section 30-2-1(A)(1) (1994), or in the alternative felony murder contrary to NMSA 1978, Section 30-2-1(A)(2) (1994); kidnapping in the first-degree contrary to NMSA 1978, Section 30-4-1 (2003); armed robbery contrary to NMSA 1978, Section 30-16-2 (1973); two counts of tampering with evidence contrary to NMSA 1978, Section 30-22-5 (2003), and battery contrary to NMSA 1978, Section 30-3-4 (1963). The State later withdrew the battery charge.

**II.    DISCUSSION**

**A.    Peremptory Challenge**

**{16}** The first issue on appeal concerns Defendant's exercise of a peremptory

6

challenge to exclude Dr. Kathryn Winters from the jury. The following additional facts are relevant to this issue.

{17}   The State raised its first *Batson* challenge after Defendant used four of his peremptory challenges to exclude four white females from the jury panel: Ms. Ware, Ms. Rogers, Ms. Gann, and Ms. Perkins. Defendant asserted that the *Batson* challenge only applied to Ms. Perkins and noted that he had already accepted two white female jurors. The State argued that nothing in *Batson* suggests that such a challenge only applies to the last juror, and explained that in order to raise a *Batson* challenge the objecting party need only establish a pattern of discrimination. The district court reviewed Defendant's peremptory challenges and Defendant asserted that there was no pattern of discrimination, that there was no protected class, and that his decision to strike was random. The district court inquired as to whether *Batson* applied to gender issues as well as "ethnic issues." The State explained that *Batson* applies to both gender and race issues, and that in order for *Batson* to apply a pattern of discrimination must have been established. The district court then asked Defendant to provide reasons for his challenges. Defendant stated that the decision to peremptorily strike these venier persons was based on "information," a potential juror's interactions with counsel, and personal choice. The district court did not rule

on the State's *Batson* challenge at that time, but stated it would keep the State's concerns in mind.

{18} The jury selection process continued and Defendant used two more peremptory challenges to strike two white females, Ms. Crowder and Dr. Winters. The State then raised another *Batson* challenge. Defendant argued that his decision to excuse Dr. Winters was based on the fact that she was a physician, had testified as a government witness, and had worked with law enforcement. Defendant also asserted that he was removing Dr. Winters because she knew the prosecutor. Mr. Chandler stated that he did not know Dr. Winters.

{19} The record reflects that when the judge asked the potential jurors if they knew Mr. Chandler, Dr. Winters mentioned that she knew the prosecutor because he was a public figure, but that she did not know him personally, and that she could be unbiased. Neither party questioned Dr. Winters on this matter.

{20} The district court denied Defendant's peremptory challenge and Dr. Winters was placed on the jury. Defendant filed a motion requesting the district court reconsider its *Batson* ruling. In the motion, Defendant stated that Dr. Winters was being excused because she had served as a government witness, and was a physician. Defendant attached Dr. Winters' juror questionnaire to his motion, which indicated

8

that Dr. Winters had testified in a criminal child abuse case. Defendant's motion was denied, Dr. Winters was placed on the jury, and became the foreperson.

{21} Defendant argues that the State failed to make a prima facie showing that Defendant used his peremptory challenges in a discriminatory manner and therefore the district court erred in denying him his right to peremptorily exclude Dr. Winters. Defendant claims that to make a prima facie showing that a peremptory challenge was race or gender motivated, a party must show that: (1) the defendant is a member of a cognizable race or gender; (2) the party has exercised its peremptory challenges to remove members of that group from the jury panel; and (3) these facts, and any other relevant circumstances, raise an inference that the party used its challenges to exclude members of the panel solely on account of their race or gender. Defendant contends that the State satisfied the first two prongs, but failed to provide sufficient facts to raise the inference that Defendant's peremptory challenges were based solely on gender.

{22} The State asserts that Defendant's use of seven of his eight peremptory challenges to remove white females from the jury panel was a prima facie showing of purposeful discrimination. The State relies on *State v. Gonzales*, 111 N.M. 590, 808 P.2d 40 (Ct. App. 1991), to support this assertion. In *Gonzales,* the Court of Appeals

9

held that the defendant's "showing that the state used eighty percent of its peremptory challenges to eliminate members of his racial group from the jury was a prima facie showing of intentional discrimination, and shifted the burden to the [state] to come forward with a racially neutral explanation" for the use of the peremptory challenges. 111 N.M. at 596-97, 808 P.2d at 46-47. The Court further held that the fact that a few of the jurors were the same race as the defendant was not determinative of whether a prima facie showing of purposeful discrimination had been made, but that such information was relevant when determining whether there was a prima facie showing of purposeful discrimination. *Id.*

{23}    The State also claims that Defendant's argument regarding the State's alleged failure to make a prima facie showing of purposeful discrimination was not preserved. Defendant contends that this issue was properly preserved when, after the State objected to his use of a peremptory challenge to remove Dr. Winters, he argued the exercise was proper pursuant to *Batson*.

{24}    In order for a question to be preserved for review, "it must appear that a ruling or a decision by the district court was fairly invoked." Rule 12-216 NMRA. A ruling or decision is fairly invoked if a party's objection or motion is "made with sufficient specificity to alert the mind of the [district] court to the claimed error." *Kilgore v. Fuji*

*Heavy Indus. Ltd.*, 2010-NMSC-040, ¶ 26, 148 N.M. 561, 240 P.3d 648 (internal quotation marks and citation omitted). Therefore, "[t]o preserve an argument for appellate review, it must appear that an appellant fairly invoked a ruling of the trial court on the same grounds argued in the appellate court." *Schuster v. State Dep't. of Taxation & Revenue, Motor Vehicle Div.*, 2012-NMSC-025, ¶ 33, 283 P.3d 288 (internal quotation marks and citation omitted); *see State v. Paiz*, 2011-NMSC-008, ¶ 27, 149 N.M. 412, 249 P.3d 1235 (providing "[a] defendant must make a timely objection that specifically apprises the trial court of the nature of the claimed error and invokes an intelligent ruling thereon") (internal quotation marks and citation omitted).

**{25}** After the district court granted the State's *Batson* challenge and denied Defendant's peremptory challenge regarding Dr. Winters, Defendant filed a motion requesting that the district court reconsider its decision, which the district court subsequently denied. Defendant's motion for reconsideration, therefore, alerted the district court of the claimed error and preserved the question regarding whether the district court erred in granting the State's *Batson* challenge.

**{26}** We employ a deferential standard of review when reviewing a district court's factual findings regarding a *Batson* challenge as it is "the responsibility of the [district] court to (1) evaluate the sincerity of both parties, (2) rely on its own

11

observations of the challenged jurors, and (3) draw on its experience in supervising voir dire." *State v. Salas*, 2010-NMSC-028, ¶ 33, 148 N.M. 313, 236 P.3d 32 (internal quotation marks and citation omitted). The ultimate issue of constitutionality, however, is reviewed de novo. *Id.*

**{27}** In determining whether a party has exercised his or her peremptory challenges in a purposefully discriminatory manner, the party alleging a *Batson* violation must make a prima facie showing that "(1) a peremptory challenge was used to remove a member of a protected group from the jury panel, and (2) the facts and other related circumstances raise an inference that the individual was excluded solely on the basis of his or her membership in a protected group." *Salas*, 2010-NMSC-028, ¶ 31. If the party challenging the use of the peremptory challenge makes a prima facie showing, then the burden shifts to the proponent of the challenge to offer a facially valid race or gender-neutral explanation for the challenge. *Id.* ¶ 32. "Unless a discriminatory intent is inherent in the . . . explanation, the reason offered will be deemed race [or gender]-neutral." *Id.* (second alteration in original). If the district court finds the reason to be facially valid then the party opposing the peremptory challenge is allowed to refute the stated reason, or otherwise establish purposeful discrimination. *State v. Jones*, 1997-NMSC-016, ¶ 3, 123 N.M. 73, 934 P.2d 267. The district court must then

determine whether the opponent of the strike has refuted the facially valid reason and established purposeful discrimination. *Salas*, 2010-NMSC-028, ¶ 32; *see Gonzales*, 111 N.M. at 597, 808 P.2d at 47.

**1.     Prima Facie Showing**

{28}     The record reflects that Defendant failed to assert an objection regarding the State's alleged failure to establish a prima facie case of purposeful discrimination, and the district court did not specifically rule on whether the State made a prima facie showing. However, "[o]nce a [party] has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the [party raising the *Batson* challenge] made a prima facie showing becomes moot." *State v. Gerald B.*, 2006-NMCA-022, ¶ 32, 139 N.M. 113, 129 P.3d 149 (quoting *Hernandez v. New York*, 500 U.S. 352, 359 (2006)) (first alteration in original). Although a district court should make a thorough record, in situations when, without prompting, a party offers a race or gender neutral explanation for a peremptory challenge a specific ruling by the district court regarding whether the objecting party made a prima facie case is not necessary. *See Gerald B.*, 2006-NMCA-022, ¶ 32; *Zakour v. UT Med. Group, Inc.*, 215 S.W.3d 763, 770 (providing that "[b]ecause the [d]efendants explained their

13

reasons for the peremptory challenges without prompting by the trial court, the trial court did not make a determination that the [p]laintiff had established a prima facie case of purposeful discrimination," and that such a ruling was not necessary under the circumstances").

**2.      Gender-Neutral Reason**

{29}      In the second step of the *Batson* analysis, the burden shifts to the party exercising the peremptory challenge to articulate a gender-neutral and facially valid explanation for the challenge. *See Gerald B.*, 2006-NMCA-022, ¶ 33; *see also Jones*, 1997-NMSC-016, ¶ 3.  Here, Defendant explained that his decision to peremptorily excuse Dr. Winters was based on the fact she had indicated on her juror questionnaire that she had served as a government witness, and that she stated she knew the prosecutors.  The reasons offered by Defendant were both facially neutral and specific to Dr. Winters.  Therefore, Defendant offered a facially valid gender-neutral reason to support his decision to peremptorily strike Dr. Winters from the jury.  Therefore, we now turn to whether the State adduced evidence to refute Defendant's assertions.

**3.      Rebuttal Evidence**

{30}      The third step of the *Batson* analysis required the State to adduce evidence to refute Defendant's explanation or otherwise prove that Defendant had used his

peremptory challenges in an intentionally discriminatory manner. *See State v. Begay*, 1998-NMSC-029, ¶ 14, 125 N.M. 541, 964 P.2d 102 ("A peremptory challenge that is found to be valid on its face stands unless the defendant comes forward with a refutation of the stated reason—e.g., by challenging its factual basis—or proof of purposeful discrimination by the prosecutor.").

{31}     The State challenged the factual basis of Defendant's assertions.  Defendant stated that Dr. Winters listed on the questionnaire that she had been a witness for the government.  The State refuted Defendant's assertion noting that neither prosecutor had used Dr. Winters as a government witness, and nothing on Dr. Winters' questionnaire contained information suggesting she served as a government witness.  The record reveals that Dr. Winters' jury questionnaire form indicates that she had previously been a witness in a child abuse case, but does not state that she was a witness for the government.  The State was able to refute Defendant's factual allegations regarding Dr. Winters status as a government witness to the district court's satisfaction. The State also refuted Defendant's allegations that Dr. Winters knew the prosecutor in any capacity other than as a public figure.  In light of the State's rebuttal evidence, the district court found that there had been purposeful discrimination.

{32}     Because a district court's determination regarding a *Batson* challenge will only

be reversed if it is determined that the district court abused its discretion, we defer to the district court's determination that Defendant failed to provide the court with a gender-neutral reason to justify peremptorily excusing Dr. Winters. Therefore, based on what the district court believed to be a pattern of purposeful discrimination and the State's ability to refute Defendant's gender-neutral justifications, we affirm the district court's decision to allow Dr. Winters to serve on the jury.

**B.      Confrontation Clause**

{33}      The second issue raised on appeal is whether the district court violated Defendant's right to confrontation by allowing the State's fingerprint expert to testify about tests which she neither performed nor supervised. The following facts are relevant to this issue.

{34}      The State offered Ms. Ferguson as an expert in fingerprint analysis who would offer her own expert opinion regarding the fingerprint analysis conducted by Mr. Knoll. Defendant asserted that Ms. Ferguson should not be permitted to testify because the State, by qualifying Ms. Ferguson as an expert witness, was attempting to get the fingerprint analysis in through "the back door." The district court, over Defendant's objection, allowed the State to offer Ms. Ferguson as an expert in fingerprint analysis and to testify at trial.

16

{35} Ms. Ferguson testified regarding a fingerprint analysis that was conducted by another lab technician, Mr. Knoll. Ms. Ferguson stated that she had not evaluated the evidence on which the report was based, nor had she done a separate analysis of the fingerprint evidence, and that her knowledge was based solely on Mr. Knoll's report. Ms. Ferguson testified as to the conclusions reached by Mr. Knoll and did not offer any of her own conclusions as to the validity of the report. Ms. Ferguson's testimony, therefore, was a recitation of the information contained in Mr. Knoll's report and was used to place Vargas, and Rodriguez in the company truck. None of the fingerprints contained in the fingerprint analysis belonged to Defendant.

{36} The Confrontation Clause bars "[o]ut-of-court testimonial statements . . . unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness . . . ." *State v. Zamarripa*, 2009-NMSC-001, ¶ 23, 145 N.M. 402, 199 P.3d 846 (citing *Crawford v. Washington*, 541 U.S. 36, 68 (2004)). The main purpose of the Confrontation Clause is to ensure that the accused has the opportunity to confront witnesses against him. *See Bullcoming v. New Mexico*, 564 U.S.__, __, 131 S. Ct. 2705, 2713 (2011) ("The Sixth Amendment's Confrontation Clause confers upon the accused in all criminal prosecutions, . . . the right . . . to be confronted with the witnesses against him.") (alterations in original) (internal quotation marks and

citation omitted). Therefore, the admission of a testimonial statement does not violate the Confrontation Clause so long as the witness is unavailable to testify and the accused has had a prior opportunity to confront the witness. *Id.*

{37} The question of whether the admission of testimony violates the accused's rights under the Confrontation Clause is a question of law that is reviewed de novo. *State v. Lopez*, 2011-NMSC-035, ¶ 10, 150 N.M. 179, 258 P.3d 458. Once a reviewing court has concluded that there has been a Confrontation Clause violation, the constitutional standard of review, harmless beyond a reasonable doubt, applies. *State v. Tollardo*, 2012-NMSC-008, ¶ 34, 275 P.3d 110; *Lopez*, 2000-NMSC-003, ¶ 20. In applying the harmless beyond a reasonable doubt standard of review "a reviewing court should only conclude that an error is harmless when there is no reasonable *possibility* [that] it affected the verdict." *State v. Barr*, 2009-NMSC-024, ¶ 53, 146 N.M. 301, 210 P.3d 198, *overruled on other grounds by Tollardo*, 2012-NMSC-008, ¶ 37; *see Tollardo*, 2012-NMSC-008, ¶ 34.

{38} The present case presents a factual scenario that is very similar to that in *Bullcoming v. New Mexico*, 131 S. Ct. 2705. In *Bullcoming*, the State offered into evidence a forensic laboratory report containing a testimonial certification through the in-court testimony of a scientist who neither performed nor observed the test reported

18

in the certification. *Id.* at 2709-10.  The United States Supreme Court concluded that the document was testimonial in nature; the defendant did not have a prior opportunity for cross examination; that the State had failed to establish that the scientist who conducted the testing was unavailable to testify, and therefore the defendant's confrontation rights had been violated.  *Id.* at 2717-19.  In so doing, the Court held that unless the individual who created the report is unavailable and the accused has had a prior opportunity to cross-examine the individual responsible for the report, the testimony of a witness who did not personally create the report violates the accused's right to confront his accuser.  *Id.*

{39}     Defendant asserts that allowing Ms. Ferguson to testify regarding a fingerprint analysis that was performed by another denied him the opportunity for cross-examination and violated his confrontation rights.  The State agrees with Defendant that his right to confrontation was violated, but asserts that any harm resulting from the admission of Ms. Ferguson's testimony was harmless.  Because it is uncontested that Ms. Ferguson's testimony violated Defendant's rights under the Confrontation Clause, our review will center on whether Defendant was harmed by this violation.

{40}     The State asserts that any harm resulting from the admission of Ms. Ferguson's testimony was harmless.  The State relies on *State v. Aragon,* 2010-NMSC-008, 147

19

N.M. 474, 225 P.3d 1280, *overruled by Tollardo*, 2012-NMSC-008, ¶ 37 n. 6. In *Aragon*, this Court relied on the factors espoused in *State v. Moore*, 94 N.M. 503, 612 P.2d 1314 (1980), *overruled by Tollardo*, 2012-NMSC-008, ¶ 37 n. 6, and held that in determining whether an error is harmful a reviewing court should consider the existence of substantial evidence to support the conviction, the existence of a disproportionate volume of permissible evidence in comparison to impermissible evidence, and the absence of any conflicting evidence that would discredit the state's testimony. *Aragon*, 2010-NMSC-008, ¶ 35. However, since the time the parties submitted their briefs to this Court, we issued *Tollardo*, in which we clarified our harmless-error standard of review, overruled *Moore*, and in turn *Aragon*'s reliance on the *Moore* factors. *See Tollardo*, 2012-NMSC-008, ¶ 37 n.6.

**{41}** In *Tollardo*, we explained that in determining whether the admission of the evidence was harmful, a reviewing court must first determine whether the improperly admitted evidence had constitutional implications. *See, e.g., Aragon*, 2010-NMSC-008, ¶¶ 35, 37 (applying constitutional harmless error analysis where the erroneous admission of hearsay reports violated the defendant's confrontation rights); *see also Barr*, 2009-NMSC-024, ¶ 53 (distinguishing between the harmless error analysis in the context of constitutional rights and non-constitutional rights and providing that a

20

non-constitutional harmless error analysis should apply where the error concerns a violation of statutory law or court rules, such as an evidentiary ruling by the trial court). Improperly admitted evidence implicating a defendant's constitutional rights will only be deemed harmless if there is no reasonable possibility it affected the verdict. *Barr*, 2009-NMSC-024,¶ 53. When, however, the improperly admitted evidence does not have constitutional implications then a reviewing court should only conclude that an error is harmless "when there is no reasonable *probability* the error affected the verdict." *Barr*, 2009-NMSC-024, ¶ 53.

{42}    Because admitting Ms. Ferguson's testimony violated Defendant's right to confrontation we must now examine whether the district court's error in admitting Ms. Ferguson's testimony was harmless beyond a reasonable doubt. *Tollardo*, 2012-NMSC-008, ¶ 36; *Barr*, 2009-NMSC-024, ¶ 55. Whether the violation was harmless beyond a reasonable doubt, requires us to "evaluate all of the circumstances surrounding the error" and determine whether there is a reasonable possibility that the error affected the verdict. *Tollardo*, 2012-NMSC-008, ¶ 43; *Barr*, 2009-NMSC-024, ¶ 55.

{43}    In determining whether there is a reasonable possibility that the verdict was affected by the error, a reviewing court must examine "the error itself, which

21

depending upon the facts of the particular case could include an examination of the source of the error and the emphasis placed upon the error." *Tollardo*, 2012-NMSC-008, ¶ 43. In conducting this evaluation evidence of a defendant's guilt, separate from the error, may provide context for understanding the circumstances regarding how the error arose and what role it may have played in the trial proceedings. *Id.* This, however, should not be treated as the primary focus of the inquiry.

{44} When reviewing the impact that an error may have had on the verdict, courts may consider the importance of the improperly admitted evidence to the prosecution's case, as well as whether the improperly admitted evidence was cumulative of other properly admitted evidence or established new facts. *State v. Johnson*, 2004-NMSC-029, ¶ 11, 136 N.M. 348, 98 P.3d 998 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)). We again stress, just as we did in *Tollardo*, that such considerations are not to be viewed as replacing the *Moore* factors and that the mere fact that the improperly admitted evidence was cumulative of other properly admitted evidence does not automatically render the error harmless beyond a reasonable doubt. *Tollardo*, 2012-NMSC-008, ¶ 43. Here, Defendant asserts that the error was not harmless beyond a reasonable doubt because the testimony placed his co-workers at the crime scene which made their testimony against him more credible in the eyes of

the jury. The State, employing the *Moore* factors, contends that the admission of Ms. Ferguson's testimony was harmless because Ms. Ferguson's testimony did not establish a material fact, there was substantial evidence to support Defendant's convictions, and the testimony was cumulative of other evidence that established that the two men were Defendant's co-workers and that the men used the truck to travel to and from job sites.

{45}     The admission of Ms. Ferguson's testimony was harmless beyond a reasonable doubt. Ms. Ferguson's testimony regarding the finger print analysis placed Vargas and Rodriguez in the company truck. However, because none of the fingerprints contained in the fingerprint analysis belonged to Defendant, Ms. Ferguson's testimony did not place Defendant in the truck or at the scene of the crime. Ms. Ferguson's testimony therefore was not crucial to the State's ability to prove its case. Moreover, Vargas testified that Defendant, Rodriguez, and Soto traveled from Roswell to Clovis in the company truck. Rodriguez also provided testimony that placed himself and Vargas in the company work truck, and Soto testified that after leaving Webb's he, Defendant, Vargas, and Victim were all in the company truck. Thus, the information to which Ms. Ferguson testified was cumulative of other evidence establishing that Rodriguez and Vargas had been in the company truck. We find it important to note

23

that the fact that Ms. Ferguson's testimony was cumulative of other properly admitted evidence does not alone render the error harmless. However, that fact coupled with the fact that the fingerprint analysis did not contain information regarding Defendant's fingerprints, and the minimal role this testimony appears to have played in the State's case, we conclude that there is no reasonable possibility that the improperly admitted evidence affected the verdict.

{46} Accordingly, we hold that based on the totality of the circumstances surrounding Ms. Ferguson's testimony there is no reasonable possibility that her testimony affected the verdict, and therefore the violation of Defendant's right to confrontation was harmless beyond a reasonable doubt.

**C.    Motion for Mistrial**

{47} In his third issue on appeal, Defendant claims that the district court erred in denying his motion for a mistrial. Defendant offers this argument pursuant to *State v. Franklin*, 78 N.M. 127, 428 P.2d 982 (1967) and *State v. Boyer*, 103 N.M. 655, 715 P.2d 1 (Ct. App. 1985), which require appellate counsel to advance a defendant's arguments even if the merits of the argument are questionable.

{48} Defendant filed a motion in limine requesting the district court preclude the State from making any mention of the brass knuckles that were found in Defendant's

24

truck. The parties stipulated that there would be no mention of the brass knuckles. Contrary to the parties' stipulation, the brass knuckles were mentioned twice at trial during the State's DNA analyst's testimony. The State's analyst mentioned the brass knuckles when listing the items she received from the sheriff's department, and again when she listed the items she received that did not contain traces of blood. The State then moved to have the analyst's report admitted into evidence. Defendant objected and requested a mistrial. The State argued that the analyst's report did not advise the jury as to whom the brass knuckles belonged, that the mention of the brass knuckles was a mistake, and that the report did not link the brass knuckles to Defendant. Defendant argued that because the report indicated that the brass knuckles came from the Defendant's truck, the jury could infer that the brass knuckles belonged to Defendant. The district court denied Defendant's request for a mistrial and ordered that the portions of the DNA report mentioning the brass knuckles be redacted before the report was submitted to the jury.

**{49}** The State asserts that Defendant's argument is without merit as Defendant did not object the first time the brass knuckles were mentioned, did not request that the district court issue a curative instruction to the jury regarding the mention of the brass knuckles, and failed to demonstrate how he was prejudiced by the mention of the brass

25

knuckles. The State further contends that because the analyst's report was redacted before it was given to the jury, and the DNA analyst only mentioned the brass knuckles in passing, that the district court was correct in denying Defendant's motion for mistrial.

{50} This Court has recognized that the district court is in the best position to know whether a miscarriage of justice warranting a mistrial has taken place. *State v. Sutphin*, 107 N.M. 126, 130, 753 P.2d 1314, 1318 (1988). Because the district court is in the best position to determine whether a mistrial would be appropriate, we "review a [district] court's denial of a motion for a mistrial under an abuse of discretion standard." *State v. Gallegos*, 2009-NMSC-017, ¶ 21, 146 N.M. 88, 206 P.3d 993 (internal citation and quotation marks omitted). Thus, in the absence of a clearly erroneous decision, the district court's decision whether to grant or deny a party's request for a mistrial is entitled to great weight. *Sutphin*, 107 N.M. at 130, 753 P.2d at 1318; *see State v. Garcia*, 2005-NMCA-042, ¶ 38, 137 N.M. 315, 110 P.3d 531 (applying an abuse of discretion standard of review when reviewing a district court's decision to grant or deny a mistrial).

{51} Because the portion of the DNA report referencing the brass knuckles was redacted before it was presented to the jury, and because the DNA analyst's testimony

only referenced the brass knuckles twice in passing, we conclude that Defendant has failed to demonstrate that the DNA analyst's mention of the brass knuckles gave rise to a level of prejudice warranting a mistrial. *See Sutphin*, 107 N.M. at 130, 753 P.2d at 1318 (providing that the power to declare a mistrial should be used with great caution); *see State v. Gonzales*, 2000-NMSC-028, ¶ 37, 129 N.M. 566, 11 P.3d 131 (providing any prejudicial effect of inadmissible testimony is deemed to be cured when the district court promptly admonishes the jury to disregard what it has heard) (internal quotation marks and citation omitted), *overruled on other grounds by Tollardo*, 2012-NMSC-008, ¶ 37 n.6. Accordingly, we conclude that the district court did not abuse its discretion in denying Defendant's motion for a mistrial.

**D.    Jury Instruction**

{52}    Defendant's fourth issue on appeal is whether the district court improperly instructed the jury on the elements of willful and deliberate murder. The jury instruction issued in this case provided the following:

> For you to find the Defendant guilty of First Degree Murder by a deliberate killing as charged in Count 1, the State must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:
>
> (1) The Defendant killed [Victim];
>
> (2) <u>The killing was the deliberate intention to take</u>

27

away the life of [Victim];

(3) The [D]efendant was not intoxicated from the use of alcohol at the time the offense was committed to the extent of being incapable of forming an intent to take away the life of another;

(4) This happened in New Mexico on or about the 2nd day of April, 2009.

A deliberate intention refers to the state of mind of the defendant. A deliberate intention may be inferred from all of the facts and circumstances of the killing. The word deliberate means arrived at or determined upon as a result of careful thought and the weighing of the consideration for and against the proposed course of actions. A calculated judgment and decision may be arrived at in a short period of time. A mere unconsidered and rash impulse, even though it includes an intent to kill, is not a deliberate intention to kill. To constitute a deliberate killing, the slayer must weigh and consider the question of killing and his reason for and against such choice.

{53} Defendant claims the above underlined language misled the jury regarding the intent element. The Uniform Jury Instruction, UJI 14-201 NMRA, on which the above instruction is based, differs from the issued instruction by only one word. The second element of UJI 14-201 provides: (2) The killing was *with* the deliberate intention to take away the life of _____(name of victim) [or any other human being]. UJI 14-201 (emphasis added). Defendant claims the omission of the word "with" from the second element of the jury instruction confused and misled the jury. The State contends that the omission of the word "with" was not misleading and did

28

not relieve the jury of the need to find an essential element of the crime charged. The State, therefore, contends that the jury instruction was sufficient as issued.

{54} The standard of review that applies when reviewing jury instructions depends on whether the issue was preserved below. *State v. Sandoval*, 2011-NMSC-022, ¶ 13, 150 N.M. 224, 258 P.3d 1016. If the issue was properly preserved, then we will review the instruction for reversible error. *Id.* If, on the other hand, the issue was not preserved below, then we review the issue for fundamental error. *Id.* Under both standards we must determine "whether a reasonable juror would have been confused or misdirected by the jury instruction." *Id.* ¶ 13 (internal quotation marks and citation omitted).

{55} Defendant contends that, although the issue regarding the jury instruction was not preserved below, the issued first-degree murder jury instruction misled the jurors as to the element of intent, and therefore should be reviewed for fundamental error. We have held that the "doctrine of fundamental error applies only under exceptional circumstances and only to prevent a miscarriage of justice." *Barber*, 2004-NMSC-019, ¶ 8, 135 N.M. 62, 92 P.3d 633. An error is fundamental, when it goes to "the foundation of the case or take[s] from the defendant a right which was essential to his [or her] defense and which no court could or ought to permit him [or her] to waive."

29

*Id.* (internal quotation marks and citations omitted). Fundamental error review, therefore, is designed to see that a person's fundamental rights are protected in every case. *Id.* A court's power to review for fundamental error, however, is to be exercised guardedly and "never in aid of strictly legal, technical, or unsubstantial claims." *State v. Traeger*, 2001-NMSC-022, ¶ 18, 130 N.M. 618, 29 P.3d 518. In examining whether the omission of the word "with" in the second element of the jury instruction amounted to fundamental error, we must "determine whether a reasonable juror would have been confused or misdirected by the jury instruction." *See Barber*, 2004-NMSC-019, ¶¶ 18-19. In evaluating the adequacy of a jury instruction, the jury instruction must be considered as a whole, and if it substantially follows the language of the statute or uses language that is equivalent to the statute, then it is sufficient. *Id.* ¶ 19.

**{56}** Section 30-2-1(A) defines murder in the first-degree as

> the killing of one human being by another without lawful justification or excuse, by any of the means with which death may be caused: (1) by any kind of willful, deliberate, and premeditated killing; (2) in the commission of or attempt to commit any felony; or (3) by any act greatly dangerous to the lives of others, indicating a depraved mind regardless of human life.

**{57}** The second element of the issued jury instruction which provided, "(2) The killing was the deliberate intention to take away the life of Ron Hittson," was not the type of error that can be said to have confused or misled a reasonable jury regarding

30

the element of intent. The language contained in the issued instruction is equivalent to both the Uniform Jury Instruction and the statute governing willful and deliberate murder. *See* Section 30-2-1(A); UJI 14-201. Therefore, we conclude that the omission of the word "with" from jury instruction number four was not the type of omission that would have confused or misled a reasonable juror when determining whether Defendant acted with the deliberate intention of taking Victim's life. Accordingly, this error does not give rise to the type of fundamental error that would warrant reversal of the jury's verdict.

**E.      Motions for Continuances**

{58}     Defendant's fifth issue on appeal is whether the district court abused its discretion when it denied two of his motions for continuance.

{59}     A grant or denial of a motion for continuance is reviewed for an abuse of discretion. *State v. Salazar*, 2007-NMSC-004, ¶ 10, 141 N.M. 148, 52 P.3d 135. The decision to grant or deny "a continuance is within the sound discretion of the [district] court, and the burden of establishing abuse of discretion rests with the defendant." *Id.* In establishing that the district court abused its discretion, the defendant must show that not only was the ruling clearly against the logic and effect of the facts and circumstances of the case, but that the abuse of discretion prejudiced the defendant.

31

*Id.* In establishing prejudice, a defendant need only show that the "[district] court's order may have made a potential avenue of defense unavailable to the defendant." *Id.* ¶16. However, "[w]hen reasons both supporting and detracting from a decision exist, there is no abuse of discretion." *In re Camino Real Envtl. Ctr., Inc.*, 2010-NMCA-057,¶ 23, 148 N.M. 776, 242 P.3d 343. In *State v. Torres*, we held that in determining whether a motion for continuance should be granted or denied, a trial court should consider the following factors,

> the length of the requested delay, the likelihood that a delay would accomplish the movant's objectives, the existence of previous continuances in the same matter, the degree of inconvenience to the parties and the court, the legitimacy of the motives in requesting the delay, the fault of the movant in causing a need for the delay, and the prejudice to the movant in denying the motion.

1999-NMSC-010, ¶ 10, 127 N.M. 20, 976 P.2d 20.

{60}  We employ the above standards in our review of the district court's denial of Defendant's motions for continuance.

**1.  Defendant' s November 20, 2009, Motion for Continuance**

{61}  Defendant's trial was originally scheduled for October 26, 2009. At the parties' September 18 status hearing, Defendant indicated that the October trial date might not be feasible but did not request a continuance until the October 7 status hearing. At the October 7 status hearing, the district court agreed to continue the trial until December

32

1, 2009, but expressed concerns about threats that were being made against witnesses and possible attempts to intimidate witnesses. The State, relying on the new December 1, 2009 trial date, issued twenty-one subpoenas.

{62} On November 20, 2009, Defendant again requested that the trial be continued until February 2010, asserting that due to attorney resignations within the public defenders' office more time was needed to prepare for trial. Defendant also requested the extension so as to allow time for more DNA testing to be conducted. Defendant asserts that the motives behind the request were legitimate and would not have inconvenienced any of the parties.

{63} The district court denied Defendant's request for a February setting, but placed the trial on a trailing docket with a tentative trial date of December 14, 2009, and a firm trial date of March 1, 2010. In assigning the December 14, 2009 trial date, the district court noted that from the date of the November 20, 2009, status hearing, Defendant would have approximately three and a half weeks to prepare for trial. In light of the continuance, the State had to notify witnesses and issue new subpoenas.

{64} Defendant asserts that the district court erred in denying his November 20, 2009, request for a continuance. The State asserts that Defendant has failed to demonstrate that the trial court abused its discretion and has failed to provide any

33

information regarding what preparations trial counsel would have made during the additional two month period or how he was prejudiced by the denial. The State, therefore, maintains that based on the factors laid out by this Court in *Torres*, the district court did not abuse its discretion in denying Defendant's November 20, 2009, motion for continuance.

{65} The district court held an hour long hearing regarding Defendant's request for a continuance, and concluded that based on the parties' report of what needed to be done before trial the parties should be prepared for trial by mid-December. The district court judge stated that Defendant's request for a continuance seemed to be based more on personnel issues at the public defenders' office than the fact he was not prepared to go to trial on this case. The district judge further expressed concerns that witnesses were being threatened.

{66} We conclude that the district court did not abuse its discretion in denying Defendant's November 20, 2009, motion for continuance. Prior to this motion Defendant had requested and received one continuance, the State had issued its subpoenas, and Defendant had not demonstrated how he would be prejudiced by the denial of the continuance. Moreover, the district court provided Defendant with an

34

additional two-weeks to prepare for trial. Accordingly, we affirm the district court's denial of Defendant's November 20, 2009, motion for a continuance.

## 2.      Defendant's December 14, 2009, Motion for Continuance

**{67}**      On the morning the trial was set to begin, Defendant testified that he had serious concerns regarding whether his current counsel was ready to proceed to trial because he had only met with counsel three times. Defendant also expressed concerns regarding the fact that counsel did not return his telephone calls. Defendant requested a continuance to hire private counsel due to his concerns that the public defender had not adequately prepared his case. Defendant asserts this issue pursuant to *Franklin*, 78 N.M. 127, 428 P.2d 982, and *Boyer*, 103 N.M. 655, 715 P.2d 1.

**{68}**      The State asserts that a party's desire to hire private counsel does not present an independent basis for a continuance, and therefore the district court did not abuse its discretion. The State contends that, although Defendant was aware of staffing issues at the public defenders' office since September 2009, he failed to raise his concerns with the district court until the day trial was scheduled to begin, after all of the witnesses had been subpoenaed, and after one hundred and twenty-nine prospective jurors had appeared. The State, therefore, asserts that the district court did not abuse its discretion in denying Defendant's motion for continuance.

{69} Assessing the district court's decision under the *Torres* factors, we conclude that the district court did not abuse its discretion in denying Defendant's motion. The district court acknowledged that the public defender's office was low on personnel, but was satisfied that Defendant's attorneys had been working hard on the case. Therefore, the district court concluded that in light of the fact that it had previously granted two continuances, another continuance was not warranted.

{70} We conclude that the district court did not abuse its discretion, and affirm the district court's denial of Defendant's motion for a continuance to hire private counsel.

**F.      Non-Crime Scene Photo of Victim**

{71} Defendant's sixth issue on appeal is whether the district court erred in admitting the non-crime scene photo of Victim. Defendant asserts that the non-crime scene photo of Victim was irrelevant and should not have been admitted at trial. Defendant further claims that even if the photograph was relevant, the photograph's probative value is substantially outweighed by the danger of unfair prejudice and should have been excluded pursuant to Rule 11-403 NMRA. *See* Rule 11-403 NMRA (2009) ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading

36

the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence.").

{72} A district court's decision to admit or exclude photographic evidence is reviewed under an abuse of discretion standard and generally will not be disturbed on appeal. *See State v. Garcia*, 2005-NMCA-042, ¶ 50, 137 N.M. 315, 110 P.3d 531 (recognizing that a district court "has great discretion in balancing the prejudicial impact of a photograph against its probative value")*; see State v. Johnson*, 57 N.M. 716, 721-22, 263 P.2d 282, 285 (1953) (providing that the admission of a photograph rests largely in the discretion of the trial judge and his decision will not be disturbed on review unless an abuse of discretion is shown). A district court will only be deemed to have abused its discretion if its decision was "clearly against the logic and effect of the facts and circumstances of the case." *Garcia*, 2005-NMCA-042, ¶ 38 (citation omitted). In the event that a district court abused its discretion by admitting photographic evidence, a reviewing court applies a harmless error analysis in reviewing the effect of the admission. *See, e.g., id.* ¶ 51 (providing whether the district court erred in admitting the photographic evidence requires us to determine whether the district court abused its discretion in admitting the photographic evidence, and if so, whether that error was harmless).

{73} The State asserts that the district court did not err in admitting the non-crime scene photograph of the victim because "New Mexico precedent supports the admissibility of pictures of deceased victims while they are alive." The State cites *State v. Upton*, 60 N.M. 205, 209-10, 290 P.2d 440, 442 (1955), to support this assertion.

{74} In *Upton*, the district court admitted two photographs of the victim after he had been killed and one "photograph of the [victim], taken while he was alive." 60 N.M. at 209, 290 P.2d at 442. The defendant challenged the admission of the photographs asserting that the photographs were "gruesome and inflammatory" and rendered the jury incapable of being impartial. *Id.* We stated that the general principal adopted in New Mexico is that "[p]hotographs which are calculated to arouse the prejudices and passions of the jury and which are not reasonably relevant to the issues of the case ought to be excluded." *Id.* We concluded, however, that the three images were neither gruesome nor inflammatory, and therefore the district court did not abuse its discretion. *Upton*, 60 N.M. at 209-210, 290 P.2d at 442-443.

{75} In this case, the State wanted to show the jury a photograph of Victim that was taken while he was alive. The original photograph offered by the State contained an image of Victim holding a baby. Defendant objected to the photograph asserting it

was irrelevant and prejudicial. The district court allowed the photograph to be shown to the jury during the State's opening statements, but required the State to redact the portion of the photograph containing the baby. The district court did not provide a rationale for its ruling. However, because the ruling of the district court is presumed valid and the burden is on the appellant to show that the district court abused its discretion, a reviewing court will not substitute its discretion for that of the district court even when the district court does not provide an explanation for its decision. *State v. Serrano*, 76 N.M. 655, 659, 417 P.2d 795, 797 (1966). Therefore, when the record is silent as to the reasons behind a district court's ruling, "regularity and correctness are presumed." *Id.*

**{76}** In *Garcia*, the district court permitted a photograph of the deceased victim that was taken while he was alive to be admitted into evidence on the ground that the state was "entitled to humanize [the v]ictim." 2005-NMCA-042, ¶ 49. In reviewing the district court's decision, the Court of Appeals recognized that there "may be instances in which a photograph of a victim while alive [will serve] no legitimate purpose [other] than to inflame the passions of the jury against a defendant." *Id.* ¶ 51. Nonetheless, the Court of Appeals affirmed the district court's decision to admit the photograph because the defendant had failed to point to any circumstances that would

39

remove the admission of the photograph from a fair humanization of the victim to the realm of unfair prejudice. *Id.*

{77} Therefore, because "every presumption is indulged in favor of the correctness and regularity of the decision of the court below," *Serrano*, 76 N.M. at 659, 417 P.2d at 797, and because we allow for a photo of a victim to be introduced into evidence for the purpose of providing a fair humanization of the victim, *Garcia*, 2005-NMCA-042, ¶ 49, we conclude that the district court did not abuse its discretion in admitting the photograph of Victim.

**G.       Sufficiency of Evidence**

{78} Pursuant to *Franklin*, 78 N.M. 127, 428 P.2d 982, and *Boyer*, 103 N.M. 655, 712 P.2d 1, Defendant asserts that there was insufficient evidence to support the charges of first-degree murder, kidnapping, armed robbery, and tampering with the evidence.

{79} "In reviewing the sufficiency of the evidence, [the evidence] must [be] view[ed] . . . in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Cunningham*, 2000-NMSC-009, ¶ 26, 128 N.M. 711, 998 P.2d 176. The test for determining the sufficiency of the evidence "is whether substantial evidence of either

40

a direct or circumstantial nature exists to support a verdict of guilt[y] beyond a reasonable doubt with respect to every element essential to a conviction." *Sutphin*, 107 N.M. at 131, 753 P.2d at 1319. "This [C]ourt does not weigh the evidence and [does] not substitute its judgment for that of the fact finder so long as there is sufficient evidence to support the verdict." *Id.* Therefore, when there is substantial evidence to support the conviction, the verdict will not be disturbed on appeal. *Id.*

**1.     First-Degree Murder Conviction**

{80}     Defendant asserts there was insufficient evidence to support his first-degree murder conviction. In support of this assertion Defendant directs this Court's attention to *State v. Garcia*, 114 N.M. 269, 837 P.2d 862 (1992). In *Garcia*, the defendant and the victim were at a party where the two men engaged in multiple arguments before the defendant ultimately stabbed and killed the victim. 114 N.M. at 270, 837 P.3d at 863. We held that "[t]here was no evidence enabling the jury to find, beyond a reasonable doubt, that defendant had the requisite state of mind—a 'willful, deliberate and premeditated' intention to kill [the victim]—to support a conviction of first[-]degree murder." 114 N.M. at 271, 837 P.2d at 864. We do not find *Garcia* to be analogous to this situation.

{81}     Section 30-2-1(A), defines murder in the first-degree as "the killing of one

human being by another without lawful justification or excuse, by any of the means with which death may be caused: (1) by any kind of willful, deliberate, and premeditated killing." The requisite state of mind for first-degree murder, therefore, is a "deliberate" intention to kill. *Id.*; *see also* UJI 14-201. Although the "word deliberate means arrived at or determined upon as a result of careful thought and the weighing of the consideration for and against the proposed course of action[,]" the weighing required for deliberate intent "may be arrived at in a short period of time." UJI 14-201. Moreover, the jury may infer from circumstantial evidence that defendant acted with the requisite intent as direct evidence of a defendant's state of mind is not required. *See State v. Largo*, 2012-NMSC-015, ¶ 31, 278 P.3d 532.

{82}    Here, in order for the jury to convict Defendant of first-degree murder the State had to prove beyond a reasonable doubt each of the following elements

        1. The Defendant killed [Victim];

        2. The killing was [with] the deliberate intention to take away the life of [Victim];

        3. The [D]efendant was not intoxicated from use of alcohol at the time the offense was committed to the extent of being incapable of forming an intent to take away the life of another;

        4. This happened in New Mexico on or about the 2nd day of April, 2009.

42

*See* UJI 14-201. The jury received sufficient evidence to find that Defendant deliberated before killing Victim. The record indicates that after Victim exited the company truck Defendant yelled to Vargas "let's get him," grabbed a cinder block from the back of the truck, and headed in the direction of Victim. At trial, the assistant chief of the Office of Medical Examiner testified that Victim received four high impact blows to his head, which rendered him unrecognizable, and that Victim had no defensive wounds on his body. Moreover, after Defendant and Vargas left Victim, Defendant convinced Vargas to return to the location where they had left Victim in order to ensure that Victim was in fact dead. Accordingly, we conclude that there was substantial evidence to support Defendant's first-degree murder conviction.

**2.      Kidnapping**

{83}      Defendant argues that the evidence presented at trial was insufficient to support his kidnapping conviction. The State asserts that there was substantial evidence to allow the jury to find that Defendant committed kidnapping by deception when Defendant allowed Victim to believe they were driving out of town to purchase drugs. *See State v. Garcia*, 100 N.M. 120, 125, 666 P.2d 1267, 1272 (Ct. App. 1983) (providing that kidnapping by deception necessarily implies that the victim is not aware that he or she is being kidnapped).

43

{84} Section 30-4-1(A)(4) defines kidnapping as the "unlawful taking, restraining, transporting or confining of a person by force, intimidation or deception, with intent: to inflict death, physical injury or a sexual offense on the victim." *Id.* Therefore, in order for Defendant to be found guilty of kidnapping, the State was required to prove that Defendant "unlawful[ly took], restrain[ed], transport[ed] or confin[ed Victim] by force, intimidation or deception, with intent to inflict death, physical injury or a sexual offense on the victim." *Id.* The term "deception," as employed in our kidnapping statute, embodies either affirmative acts intended to delude a victim or omissions that conceal the intent and purpose of an accused which results in the victim being unaware that he or she was being kidnapped. *Garcia*, 100 N.M. at 124, 666 P.2d at 1271 (providing that deception means "the act of deceiving; the intentional misleading of another by actions or falsehood"). Kidnapping by deception, therefore, usually results in the victim being denied the opportunity to exercise true free will or choice and "the induced travel from one place to another will usually appear consensual, if the [deception] is successful." *Id.*

{85} The record reflects that the evidence was sufficient to allow a reasonable jury to infer that Defendant committed kidnapping by deception when Defendant talked to Victim about scoring drugs, pretended to make numerous phone calls leading

44

Victim to believe he was trying to set up a drug deal, allowed Victim to believe they were heading to the dairies to "score" some drugs, and proceeded to quote Victim a price for the fake drug deal. Looking at the evidence in the light most favorable to the verdict, we conclude that there was sufficient evidence to support Defendant's conviction for kidnapping. Accordingly, we affirm Defendant's kidnapping conviction.

**3.     Armed Robbery**

{86}    Defendant argues that the evidence presented at trial was insufficient to support his conviction for armed robbery. Defendant further asserts that he could not be found guilty of armed robbery because the taking of the property occurred after Victim was deceased. The State asserts that a defendant can commit the offense of armed robbery regardless of whether the victim is dead or alive at the time the property was actually removed from the victim's person. The State therefore asserts that Defendant committed armed robbery when Defendant, by force or violence, removed Victim's property from Victim's person.

{87}    Section 30-16-2 defines robbery as "the theft of anything of value from the person of another or from the immediate control of another, by use or threatened use of force or violence." *Id.* A person who commits robbery "while armed with a deadly

45

weapon is, for the first offense, guilty of a second degree felony and, for second and subsequent offenses, is guilty of a first degree felony." *Id.* To convict Defendant of armed robbery the State was required to prove beyond a reasonable doubt the following elements:

> 1. The Defendant took and carried away a wallet and/or money from [Victim] or from his immediate control intending to permanently deprive [Victim] of the wallet and/or money;
>
> 2. The Defendant was armed with an instrument or object which, when used as a weapon, could cause death or very serious injury;
> 3. The Defendant took the wallet and/or money by force or violence;
>
> 4. The Defendant was not intoxicated from use of alcohol at the time the offense was committed to the extent of being incapable of forming an intention to permanently deprive [Victim] of the wallet and/or money;
>
> 5. This happened in New Mexico on or about the 2nd day of April, 2009.

*See* UJI 14-1621 NMRA.

{88}     The evidence presented at trial would allow for a reasonable jury to infer that after Defendant became aware of the amount of cash Victim had on his person, Defendant formed the intent to deprive Victim of his property. This inference is supported by the fact that after Defendant became aware of the amount of cash Victim

46

was carrying, Defendant pretended to place calls looking for drugs. When Victim informed Defendant that the quoted price was too high, Victim then exited Defendant's work truck, at which point Defendant chased Victim down and hit him over the head multiple times with a cinder block. Based on the trial testimony it is not clear whether Defendant took Victim's wallet from Victim's person after he killed Victim, or immediately before killing Victim. We conclude that the sequence of these events is irrelevant in the present case because the killing and the robbery were part of the same transaction of events. Other courts have reached similar conclusions and have found that:

> "[A]lthough, as an abstract principle of law, one ordinarily cannot be guilty of robbery if the victim is a deceased person, this principle does not apply where a robbery and homicide are a part of the same transaction and are so interwoven with each other as to be inseparable. If the taking was made possible by an antecedent assault, the offense is robbery regardless of whether the victim died before or after the taking of the property."

*James v. State*, 618 S.E. 2d 133, 138 (Ga. Ct. App. 2005); *see People v. Navarette*, 66 P.3d 1182, 1207 (Cal. 2003) (providing that "[w]hile it may be true that one cannot rob a person who is already dead when one first arrives on the scene, one can certainly rob a living person by killing that person and then taking his or her property").

{89} We conclude that although the record is unclear as to whether the deadly

47

violence preceded the theft, such circumstances do not preclude a defendant from being convicted of armed robbery where the killing and the taking of the property are part of the same transaction of events. Therefore, looking at the evidence in the light most favorable to the jury's verdict, we conclude that the jury was presented with sufficient evidence from which it could find Defendant guilty of armed robbery. Accordingly, we affirm Defendant's conviction.

**4.      Tampering with Evidence**

{90}      Tampering with evidence "consists of destroying, changing, hiding, placing or fabricating any physical evidence with intent to prevent the apprehension, prosecution or conviction of any person or to throw suspicion of the commission of a crime upon another." Section 30-22-5. Defendant asserts that there was insufficient evidence for a jury to conclude that Defendant tampered with evidence in Curry County, and therefore Curry County was not the proper venue to try this crime. In support of this assertion Defendant relies on NMSA 1978, Section 30-1-14 (1963) which governs the appropriate venue in which a criminal case is to be tried. Section 30-1-14 provides,

> [a]ll trials of crime shall be had in the county in which they were committed. In the event elements of the crime were committed in different counties, the trial may be had in any county in which a material element of the crime was committed. In the event death results from the crime, trial may be had in the county in which any material element of the crime was committed, or in any county in which the death occurred.

48

{91} The State, also relying on Section 30-1-14, asserts that there was substantial evidence from which a jury could infer that Defendant formed the intent to tamper with evidence while he was in Curry County, and therefore Curry County was a proper venue. In addition, the State relies on *State v. Smith*, in which this Court found Bernalillo County to be a proper venue because there was substantial evidence that Bernalillo was the county in which the defendant formed the intent to kill his victims. 92 N.M. 533, 537, 591 P.2d 664, 668 (1979).

{92} We conclude there was sufficient evidence that a material element of the crime tampering with evidence occurred in Curry County. The record indicates that Defendant told his co-worker, Soto, to get rid of Victim's wallet as they were driving out of Curry County to Roswell. Furthermore, the record suggests that Defendant destroyed some of the DNA evidence the morning after he killed Victim as his co-workers reported that they had seen him with a bucket, chemical bleach, and the clothes he was wearing the night before. Curry County police later found a large trash bin with jeans, boots, and a sweatshirt that had been bleached. Accordingly, we hold that there was sufficient evidence for the jury to conclude beyond a reasonable doubt that Defendant tampered with evidence in Curry County or formed the specific intent to tamper with evidence in Curry County.

49

## H. Miranda Violation

**{93}** Defendant asserts he was subject to custodial interrogation without being mirandized. The State asserts that this issue is moot as the statements made to police were not introduced at trial. Defendant concedes that the statements were not introduced at trial, and that this issue was raised pursuant to *Franklin*, 78 N.M. 127, 428 P.2d 982, and *Boyer*, 103 N.M. 655, 715 P.2d 1.

**{94}** "Miranda violations occur, if at all, only upon the admission of unwarned statements into evidence at trial." *State v. Verdugo*, 2007-NMSC-095, ¶ 16, 142 N.M. 267, 164 P.3d 966 (internal quotation marks and citation omitted). From our review of the record, and the parties' own admissions, it does not appear that the statements made during that initial interview were admitted into evidence at trial. Therefore, we hold Defendant's *Miranda* rights were not violated.

## I. Cumulative Error

**{95}** The doctrine of cumulative error only applies when "multiple errors, which by themselves do not constitute reversible error, are so serious in the aggregate that they cumulatively deprive the defendant of a fair trial." *State v. Salas*, 2010-NMSC-028, ¶ 39 (quoting *State v. Roybal*, 2002-NMSC-027, ¶ 33, 132 N.M. 657, 54 P.3d 61). The doctrine shall not be applied "when the record as a whole indicates that the

defendant received a fair trial." *Salas*, 2010-NMSC-028, ¶ 39 (internal citation and quotation marks omitted). Therefore, "[c]umulative error has no application if the district court committed no errors and if the defendant received a fair trial." *State v. Guerra*, 2012-NMSC-014, ¶ 47, 278 P.3d 1031, 1042. Because we have concluded that there were no errors and that Defendant received a fair trial, we thereby conclude there was no cumulative error.

**III.   CONCLUSION**

{96}    For the reasons stated above we affirm Defendant's convictions.

{97}    **IT IS SO ORDERED.**


_____
                                    **PETRA JIMENEZ MAES, Chief Justice**

**WE CONCUR:**



_____
**RICHARD C. BOSSON, Justice**



_____
**EDWARD L. CHÁVEZ, Justice**

51

_____

**CHARLES W. DANIELS, Justice**


_____

**BARBARA J. VIGIL, Justice**