1998-NMSC-029

964 P.2d 102

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Wayne L. BEGAY, Defendant–Appellant.**

**No. 23996.**

Supreme Court of New Mexico.

Aug. 27, 1998.

Phyllis H. Subin, Chief Public Defender, Lisabeth L. Occhialino, Assistant Appellate Defender, Santa Fe, for Defendant–Appellant.

Tom Udall, Attorney General, Steven S. Suttle, Assistant Attorney General, Santa Fe, for Plaintiff–Appellee.

## OPINION

McKINNON, Justice.

{1} Defendant Wayne L. Begay appeals his conviction for first-degree murder in the stabbing death of Quincy Jim. Defendant contends that (a) a potential juror was improperly struck form the venire, (b) the trial judge and the prosecutor made improper remarks, (c) the jury was improperly instructed regarding diminished capacity, and (d) there was insufficient evidence that Defendant formed a deliberate intent to kill. He contends further that the cumulative impact of these errors was so prejudicial that he was deprived of a fair trial. Finding no merit in these contentions, we affirm.

## I. FACTS.

{2} Althea Kinlacheeny testified that Defendant frequently watched a video of *Natural Born Killers* (Warner Bros.1994). Once or twice a week, while watching it, he would say to his brother and to Melvin Caboni, Jr., that he too wanted to "pull a fatality" some day, apparently borrowing a phrase from the film. Kinlacheeny believed Defendant was kidding when he made these remarks.

{3} On the evening of March 22, 1995, Defendant, Caboni, Kinlacheeny, and Janine Todacheeny were drinking at a friend's house, and the Defendant consumed approximately four quarts of malt liquor over the course of several hours. Defendant remarked to Kinlacheeny and Caboni that he was feeling the effects of methamphetamine which he had taken earlier.

{4} He told Kinlacheeny that he "felt like beating someone up." He also told Caboni that he wanted to do "somebody in" and "shank" someone that night. Both Kinlacheeny and Caboni thought Defendant was joking. Later that evening, Kinlacheeny tried to leave for home, but Defendant would not let her "until he did what he was going to do." She assumed he was referring to his plan to beat somebody up. Kinlacheeny recalled Defendant and Todacheeny discussing plans to find someone to beat. Not wanting to see anyone get hurt, Kinlacheeny directed Todacheeny, who was driving, to streets she knew would be empty. When Defendant asked whether they would find someone on those streets, Kinlacheeny assured him they would find someone there. When they found the streets to be empty, Defendant "got upset."

{5} At one point that evening, Defendant wondered aloud what would happen if they threw a beer bottle at a bicyclist riding on the side of the road, apparently referring to a scene in *Natural Born Killers*.

{6} They surveyed the parking lots of bars, hoping to find a drunk person to beat up. After stopping at several bars and finding no one, they stopped at My Place Bar. Defendant spoke with Quincy Jim, who staggered, slurred his speech, and reeked of alcohol. Defendant asked Kinlacheeny and Todacheeny if they could give Jim a ride home in exchange for his buying them more alcohol. Caboni believed they were going to beat up Jim, despite his having earlier thought Defendant was joking.

{7}  The group, including Jim, left the bar with Todacheeny driving, and Defendant later directed her to stop near a gate on the side of a road in a remote and unlighted area. Defendant asked Caboni to jump in if Jim fought back.  Defendant got out of the car and offered Jim a cigarette.  He then walked to the gate and yelled, "Damn! My Dad locked the gate!"  When Jim bent down to help unlock the gate, Defendant began striking him.  Caboni saw Defendant switch an object from his left hand to his right hand, but could not identify it.  Defendant continued striking Jim until he fell to the ground, at which time, both Caboni and Defendant began kicking him.

{8}  After they got back in the car, Caboni and Defendant urged Todacheeny to hurry up and go.  As they drove away, Defendant said twice or three times, "I stabbed him!" Caboni responded, "Yah, he did!"  Todacheeny and Kinlacheeny saw Defendant wipe off a knife and throw the bloody cloth out the window.  Kinlacheeny testified that Defendant twice told them not to tell anyone about what had happened because it would get back to him.  The next day, Kinlacheeny overheard Defendant tell Caboni that he had stabbed Jim eight times, and they both mentioned that they had kicked him.

{9}  Jim's body was found near the gate. An autopsy revealed that he received eight stab wounds and blunt injuries to the head consistent with being kicked with a shoe or boot.  His blood alcohol content was 0.357%. A knife was found at another location the four had visited later that evening.  A pathologist testified that the knife was the kind that might have inflicted the wounds on Jim's body.  Todacheeny testified that the knife might have been the one she saw Defendant wiping off.

## II.  PROCEEDINGS.

{10}  The State charged Defendant, Caboni, Kinlacheeny, and Todacheeny, with first-degree murder, conspiracy to commit first-degree murder, and evidence tampering.  Prior to trial, however, Todacheeny, Kinlacheeny, and Caboni entered into plea agreements in exchange for testifying against Defendant.  Kinlacheeny pleaded

guilty to aiding and abetting an aggravated battery, Caboni pleaded guilty to voluntary manslaughter, and Todacheeny pleaded guilty to aggravated battery resulting in death.  Sentencing was postponed pending completion of Defendant's trial.

{11}  A jury trial was held in San Juan County.  Defendant asserted a defense of diminished capacity due to intoxication from consumption of alcohol and/or methamphetamine.  The jury found Defendant guilty of first-degree murder by deliberate killing. *See* NMSA 1978 § 30–2–1(A)(1) (1994).  The trial court sentenced Defendant to life imprisonment. *See* NMSA 1978 § 31–18–14(A) (1993).  Defendant appealed to this Court. *See* Rule 12–102(A)(1) NMRA 1998.

## III.  DISCUSSION.

{12}  Defendant asserts five grounds for reversal and one ground for dismissal.  He alleges that his conviction should be reversed because (a) the prosecutor improperly struck a Native American from the venire, (b) the prosecutor's and trial judge's remarks regarding NATURAL BORN KILLERS improperly introduced inflammatory evidence, (c) the trial judge's question and remarks regarding methamphetamine use and "tweaking" suggested to the jury that the court did not believe Defendant's diminished capacity defense, (d) the jury was not properly instructed regarding the defense of diminished capacity, and (e) the cumulative impact of these errors deprived Defendant of a fair trial.  Defendant also contends the first-degree murder charge should have been dismissed because there was insufficient evidence that Defendant deliberately planned to kill Jim.

## A.  PEREMPTORY CHALLENGE OF NATIVE AMERICAN JUROR.

{13}  During jury selection, the State peremptorily challenged Kathleen Smiley.  Noting that both this juror and Defendant were Native Americans, the trial court asked defense counsel if he wanted to pose an objection to the State's peremptory challenge.  After Defense counsel indicated that he wanted to object, the prosecutor argued that the State need not provide a reason for

striking this juror because there was no pattern of racial discrimination in the prosecutor's peremptory challenges. The trial court noted that only one Native American had been chosen. The court again asked Defense counsel if he wanted a race-neutral explanation for the State's peremptory challenge of Smiley. Defense counsel indicated that he did. The prosecutor then explained that he did not want Smiley on the jury because she was not very responsive on the jury questionnaire and had displayed unfavorable body language. Defense counsel neither challenged the factual basis for the prosecutor's explanation nor attempted to prove that the prosecutor intentionally discriminated against this potential juror based on her race. The trial court accepted the prosecutor's reason and allowed Smiley to be stricken from the jury.

■ {14} This case is strikingly similar to *State v. Jones*, 1997–NMSC–016, 123 N.M. 73, 934 P.2d 267, where an African–American defendant in a criminal case claimed that the State had peremptorily challenged an African–American juror for racially discriminatory reasons. The trial court found the prosecutor's explanation to be reasonable—*i.e.*, a non-discriminatory, race-neutral explanation for peremptorily challenging that juror. 123 N.M. at 74, 934 P.2d at 268. A peremptory challenge that is found to be valid on its face stands unless the defendant comes forward with a refutation of the stated reason—*e.g.*, by challenging its factual basis—or proof of purposeful discrimination by the prosecutor. *Id.* at 74, 75, 934 P.2d at 268, 269. In *Jones*, the defendant failed to come forward with evidence showing the prosecutor's explanation was without basis in fact or that the prosecutor purposefully discriminated against the juror based on race. *Id.* Following federal precedent, we held that the State had met its burden of providing a race-neutral explanation for the peremptory challenge when the prosecutor explained that the challenged juror was non-assertive and failed to make eye contact. *See id.* at 73, 934 P.2d at

267; *see also Batson v. Kentucky*, 476 U.S. 79, 97–98, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

{15} Here, the prosecutor's explanation was accepted by the trial court as facially valid. Since Defendant's counsel neither challenged the prosecutor's professed reason for striking Smiley nor otherwise showed that the prosecutor intentionally discriminated, the trial court correctly ruled that the State's peremptory challenge of Smiley was proper.[1]

## B. REMARKS AND QUESTIONS ABOUT *NATURAL BORN KILLERS*.

{16} In its opening statement at trial, the State told the jury that evidence would show that Defendant liked the film, NATURAL BORN KILLERS, had seen it numerous times, and had announced his desire to "pull a fatality." The State explained that the film depicted a man and a woman on a crime spree, killing people they did not know just for the thrill of it, and that the evidence would show that Defendant had killed Jim for no other reason than the thrill of it.

{17} During the State's cross-examination of Dr. Singer, a defense expert witness on the issue of diminished capacity, the following exchange occurred:

State: Have you seen the movie, NATURAL BORN KILLERS?

Singer: I think I saw part of it.

State: It glorifies senseless killing and drug use, doesn't it? Woody Harrelson plays in it.

Singer: I really can't say because I didn't see it. I just saw part of it, and—

State: —You wouldn't have to see much of it to know that it glorified killing and drug use.

Defense Counsel: Your Honor, I'm going to object to this line of questioning.

Court: That last thing wasn't a question, it was a statement.

Defense Counsel: Yeah.

---

1. As in *Jones*, the parties here did not raise the question whether the New Mexico Constitution provides more protection from allegedly discriminatory peremptory challenges in criminal trials than is provided under the Fourteenth Amendment of the United States Constitution after *Purkett v. Elem*, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (per curiam). We leave open this question.

Court: If you want to ask a hypothetical and the doctor doesn't—Just—if you accept as true, doctor, that that movie glorifies violence and depicts criminal drug use—

State: The night—That movie also portrays a scene where they just shoot a bicyclist off the . . . bike.

Defense Counsel:èObjection.

Court: Now we're getting into the specifics of it and I don't know where you're headed. Forget about the bicycles.

State: [To the Court] We have evidence of talking about the bicyclists this time.

Court: Did I miss it?

State: [To the Court] Perhaps, because I know there was testimony that the defendant was talking about going along and offing somebody—[inaudible]—a bicyclist.

Court: Okay. Okay.

State: [To Singer] So, that sounds like a—so that's a plan, isn't it?

Singer: Yeah, if someone is making a plan, they might talk about a plan. I'm not sure I answered your question.

State: That talking about doing harm to a bicyclist sounds like a plan, doesn't it?

Singer: I don't know.

{18} In closing argument the State again returned to the NATURAL BORN KILLERS theme, telling the jury that Defendant's viewing the film was consistent with the evidence of premeditation and that this was a killing for fun. Defendant argues that the remarks by the trial judge and the prosecutor improperly introduced inflammatory and prejudicial evidence, and deprived him of a fair trial. He further claims that these remarks constitute plain error, structural defect, and/or fundamental error.

{19} The State answers that Defendant failed to object to the prosecutor's opening and closing remarks and did not object to Kinlacheeny's testimony that Defendant talked about "pulling a fatality" while watching NATURAL BORN KILLERS. Regarding the matters to which Defendant posed timely objections, the State contends that neither the trial judge nor the prosecutor testified and that a cautionary instruction

given to the jury effectively eliminated any possible prejudice that might have resulted from the prosecutor's and judge's remarks. We agree.

### 1. UNPRESERVED CLAIMS OF ERROR.

■ {20} Rule 12–216(A) NMRA 1998 provides that for a question to be preserved for review by an appellate court, "it must appear that a ruling or decision by the district court was fairly invoked." Furthermore, we have stated that "[i]f a defendant is of the opinion remarks by the prosecutor exceed the bounds of propriety, the burden is on him to make objection and call the objectionable matter to the attention of the trial court." *State v. Riggsbee*, 85 N.M. 668, 672, 515 P.2d 964, 968 (1973) (quoting *State v. Polsky*, 82 N.M. 393, 403, 482 P.2d 257, 267 (Ct.App.1971)). Defendant did not object to the State's comments about the content of the film in its opening or closing statements. He also did not object to Kinlacheeny's testimony regarding how much Defendant liked NATURAL BORN KILLERS, how often he watched the film, and his comments while watching it. Therefore, Defendant failed to preserve these claims of error.

#### a. Plain Error.

■ {21} Nevertheless, the Defendant urges us to consider the merits of these claims, arguing that the alleged errors affected his substantial rights and therefore constitute plain error. *See* Rule 11–103(D) NMRA 1998. To review an unpreserved claim of error under this rule, admission of the testimony or the prosecutor's references to NATURAL BORN KILLERS must constitute "an injustice that creates grave doubts concerning the validity of the verdict." *State v. Barraza*, 110 N.M. 45, 49, 791 P.2d 799, 803 (Ct.App.1990). After thoroughly reviewing the record, we harbor no doubts, much less grave doubts that any injustice occurred which called into question the validity of the verdict. Accordingly, we are not persuaded by Defendant's plain error argument.

#### b. Structural Defect.

■ {22} Defendant also argues that even if plain error does not apply, these

claimed errors constitute a "structural defect" under *State v. Rodriguez,* 114 N.M. 265, 837 P.2d 459 (Ct.App.1992). In *Rodriguez,* we suggested that a trial court's exclusion of the defendant from the courtroom while crucial testimony was being presented might constitute "the sort of structural defect, such as total deprivation of the right to counsel or the right to a public trial, which is not subject to harmless-error analysis." *Id.* at 268, 837 P.2d at 462. Defendant does not challenge Kinlacheeny's testimony that he frequently watched the film and that he mentioned that he wanted to "pull a fatality" many times *while watching the film.* We find no similarity between the remarks by the trial judge and the prosecutor in this case to the structural defect discussed in *Rodriguez.* Thus, we find no merit in Defendant's contention that these remarks constitute the sort of structural defect which excuses failure to preserve error.

### c. Fundamental Error.

■ {23} Next, Defendant contends that even if these unpreserved errors constitute neither plain error nor structural defect, they nevertheless should be reviewed under Rule 12–216(B) NMRA 1998, which allows an appellate court to exercise its discretion to entertain unpreserved questions of fundamental error or fundamental rights of a party. When viewed against the background of the competent and overwhelming testimony presented to the jury regarding the manner in which Jim was killed and the incriminating statements Defendant made on numerous occasions prior to and on the evening of the murder, the prosecutor's remarks neither implicate Defendant's fundamental rights nor constitute fundamental error. Therefore, the prosecutor's opening and closing remarks and Kinlacheeny's testimony regarding NATURAL BORN KILLERS, even if improper *or inadmissible, do not provide a basis for* reversal of the conviction. Next, we consider claimed errors which Defendant preserved.

### 2. PRESERVED CLAIMS OF ERROR.

■ {24} Defendant claims that the judge's remarks quoted above constitute testimony to the jury regarding the content of the film, NATURAL BORN KILLERS. We are not persuaded by Defendant's interpretation of the judge's statements. Our review of the trial tapes leads us to conclude that the trial judge sustained Defendant's first objection, told the prosecutor his last "question" was not a question, and then attempted to rephrase the hypothetical portion of the question. Moreover, we do not believe it is reasonable to assume from the exchange between judge, prosecutor, witness, and defense counsel, that the trial judge either conveyed or meant to convey the impression that the film in fact "glorifies violence and depicts criminal drug use." The context reveals that this was to be the hypothesis upon which the remainder of the question was to be based. As it turns out, the question was abandoned by the prosecutor before Singer answered. It is clear to us that the trial judge was asking a hypothetical; he was not "testifying". *Cf.* BLACK'S LAW DICTIONARY 1476 (6th Ed.1990) (defining testimony as "[e]vidence given by a competent witness, under oath or affirmation").

■ {25} Defendant asserts that hypotheticals based on the film were inappropriate because the content of the film was never introduced into evidence. In the discretion of the trial court hypothetical questions may be posed to an expert witness. *See Yardman v. San Juan Downs, Inc.,* 120 N.M. 751, 759, 906 P.2d 742, 750 (Ct.App.1995). But here the prosecutor abandoned the question before it was answered. Defendant has failed to demonstrate any prejudice suffered as a result of the prosecutor's hypothetical question. Accordingly, we find no abuse of discretion.

■ {26} Defendant next argues that the prosecutor "testified" that the movie "had a scene involving shoot[ing] a bicyclist off . . . the bike." When the prosecutor stated that "[t]hat movie also portrays a scene where they just shoot a bicyclist off the . . . bike," Defendant objected. The trial court sustained the objection and then instructed the prosecutor to move on. Any error here was cured by Defendant's timely objection and the trial court's agreement with Defendant that the prosecutor should not be making statements about the content of the film.

Furthermore, although one cannot discern from the tapes to whom any particular speaker is addressing, it is reasonable to construe the trial court's statement, "Forget about the bicycles," as being directed to the jury as a curative instruction.

{27} A few moments later, the prosecutor returned to the bicycle theme and asked whether "talking about doing harm to a bicyclist sounds like a plan." This was proper because there was testimony from Todacheeny that Defendant had discussed hitting a bicyclist with a beer bottle.

{28} Therefore, Defendant's claims regarding allegedly improper remarks and questions about NATURAL BORN KILLERS are without merit.

## C. REMARKS AND QUESTIONS ABOUT METHAMPHETAMINE USE AND "TWEAKING."

{29} Defendant called two expert witnesses to testify regarding diminished capacity: Dr. Kruis and Dr. Singer. At the close of Dr. Singer's testimony the following colloquy occurred:

Court: Bear with me, I would like to ask you a question that doesn't relate to this case, but we often see people who have used methamphetamine for years and they do what is called "tweaking." They will stand here in the courtroom sometimes and they go like this, they flinch, and they go like that, and get edgy and then bouncy and they call it "tweaking." And again, I'm talking about somebody with a substantial dose and use for years. What's "tweaking?" Do they burn something up here or what?

Singer: It sounds to me like there's been damage to the parts of the brain that control ... motor function, automatic functioning, and this is one of the areas that methamphetamine can affect. So if there is damage there or damage to the cortex that inhibits the ...— normally our muscles would twitch with this sort of inhibition. If that is damage, yes, it sounds like permanent damage.

Court: It's not like there are flies going by, but they're kind of—... a lot of people in the audience here are in this business. We see it all the time. I just didn't know what the neurological hookup was—... I don't see it with the opiates and I don't see it with coke, but we see it with meth. Are we done with the goodly doctor?

{30} Defendant contends that "because of [the trial judge's] impromptu testimony and questioning, the jury was handed a new basis for disbelieving [Defendant's] claimed methamphetamine use and was given the impression [the trial court] did not believe [Defendant's] claim that methamphetamine use resulted in diminished capacity.... [The judge] essentially made representations not previously presented to the jury by testifying regarding his observations regarding 'tweaking.'"

{31} The State answers that in Singer's testimony prior to the judge's question, Singer did not classify Defendant as a chronic abuser of methamphetamine, nor did he identify the toxic substance which he believed had affected Defendant. There was no testimony or evidence that Defendant was a long-term user of methamphetamine or that his level of use was heavy. The testimony indicated that he had used methamphetamine at a relatively light level for only ten months prior to being imprisoned, which was seventeen months prior to trial. The trial judge was apparently referring to individuals who display twitching symptoms in the courtroom. Furthermore, the trial judge emphasized that he was referring to *other* cases, not *this* case or *Defendant:* "a question that doesn't relate to this case;" "I'm talking about somebody with a substantial dose and use for years." The State also observes that prior to the colloquy, after empaneling the jury, the court instructed the jury that "[n]o statement, ruling, remark or comment which I make during the course of the trial is intended to indicate my opinion as to how you should decide the case or to influence you in any way. At times I may ask questions of witnesses. If I do, such questions do not in any way indicate my opinion about the facts or indicate the weight I feel you should give to the testimony of the witness." Rule 14–101 NMRA 1998.

{32} In this context, the trial court's question, though unorthodox and not to be recommended, was clearly not about this case or this Defendant. Therefore, we cannot agree with Defendant that "the jury was handed a new basis for disbelieving [Defendant's] claimed methamphetamine use." Nor do we agree that it gave the jury "the impression [the trial court] did not believe [Defendant's] claim that methamphetamine use resulted in diminished capacity."

{33} Although we do not approve of Judge Eastburn's use of this expert witness and this trial to satisfy his curiosity about "the neurological hookup" between methamphetamine use and twitching, we are persuaded that he made no comment on the evidence, *see State v. Sanchez*, 112 N.M. 59, 811 P.2d 92 (Ct.App.1991), nor did he question the Defendant in a manner that cast doubt on the presumption of innocence, *see State v. Caputo*, 94 N.M. 190, 608 P.2d 166 (Ct.App.1980). Furthermore, if the judge's question suggested anything to the jury, it suggested that methamphetamine use could seriously impair one's cognitive abilities, thereby bolstering Defendant's claim.

## D. DIMINISHED CAPACITY INSTRUCTIONS.

{34} The trial court instructed the jury on the elements of first-degree murder as follows:

> For you to find the defendant guilty of first degree murder by deliberate killing as charged in Count One[,] the State must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:
> 1. The defendant killed Quincy Jim;
> 2. The killing was with the deliberate intention to take away the life of Quincy Jim;
> 3. *At the time of the killing, the defendant was capable of forming the deliberate intent to take away the life of Quincy Jim, despite the use of alcohol, or alcohol and methamphetamine, if any;* . . .

(Emphasis added.) Defendant had requested that the highlighted portion be replaced by the following: "The defendant was not intoxicated from the use of alcohol or methamphetamine at the time the offense was committed to the extent of being incapable of forming an intent to take away the life of another . . ." The trial court refused this request.

{35} The trial court also gave the following instruction regarding the defense of diminished capacity:

> Evidence has been presented that the defendant was intoxicated from the use of alcohol, or alcohol and methamphetamine. You must determine whether or not the defendant was intoxicated from the use of alcohol, or alcohol and methamphetamine, and if so, what effect this had on his ability to form the deliberate intention to take away the life of Quincy Jim.
>
> If you have a reasonable doubt as to whether the defendant was capable of forming such an intention, you must find the defendant not guilty of First Degree Murder by deliberate killing.
>
> In the lesser included charge, under Count I, Second Degree Murder, the deliberate intention to take the life of another is not an element.

Defendant had requested that the court give the following instruction rather than the foregoing one:

> Evidence has been presented that the defendant was intoxicated from the use of alcohol and methamphetamine. You must determine whether or not the defendant was intoxicated from the use of alcohol and methamphetamine and if so, what effect this had on the defendant's ability to form the deliberate intention to take away the life of another.
>
> The burden is on the state to prove beyond a reasonable doubt that the defendant was capable of forming a deliberate intention to take the life of another. If you have a reasonable doubt as to whether the defendant was capable of forming such an intention, you must find the defendant not guilty of first degree murder by deliberate killing.

{36} Defendant argues that the court's instructions are at odds with *State v. Parish*, 118 N.M. 39, 878 P.2d 988 (1994), because they do not clearly and unambiguously state that the State must prove beyond a reason-

able doubt that Defendant was capable of forming a deliberate intent to take the life of another. He contends the jury was not instructed that the capacity to form a deliberate intent to kill another is an essential element of first-degree murder. He also claims that the reference to "if any" in the highlighted portion of the first-degree murder instruction "borders on a comment on the evidence."

{37} The State argues that Defendant was not entitled to a diminished capacity instruction because he did not present evidence "showing or tending to show that defendant consumed an intoxicant and the intoxicant affected his mental state at or near the time of the homicide." *State v. Privett,* 104 N.M. 79, 82, 717 P.2d 55, 58 (1986). The State also contends that the instructions clearly and unambiguously placed the burden on it to prove beyond a reasonable doubt that Defendant was capable of forming a deliberate intent to take away the life of another.

{38} Before addressing the adequacy of the instructions, we consider the State's contention that Defendant failed to present sufficient evidence of diminished capacity to warrant an instruction on that defense. Where the record contains evidence which "reasonably tends to show that defendant's claimed intoxication rendered him incapable of acting in a purposeful way," an instruction on diminished capacity is warranted. *Cf. State v. Luna,* 93 N.M. 773, 780, 606 P.2d 183, 190 (1980)(holding instruction on diminished capacity properly refused). In this case, there was testimony from Kinlacheeny, Todacheeny, and Caboni about Defendant's alcohol consumption and possible use of methamphetamine. There was expert testimony that these two substances in combination could impair one's ability to form a deliberate intent to kill. This was sufficient evidence to support the giving of an instruction on diminished capacity.

{39} The jury was instructed that "the State must prove to your satisfaction beyond a reasonable doubt ... [that] ... [a]t the time of the killing, the defendant was capable of forming the deliberate intent to take away the life of Quincy Jim, despite the use of alcohol, or alcohol and methamphet-

amine, if any." The instructions enumerated this element separately and referred to it as an "element[ ] of the crime." The jury was also instructed that "[i]f you have reasonable doubt as to whether the defendant was capable of forming such an intention, you must find the defendant not guilty of First Degree Murder by deliberate killing." These instructions did not confuse the burden of proof. We believe they indicated clearly that Defendant's ability to form the deliberate intent to take the life of another in spite of his possible intoxication was an essential element which the State was required to prove beyond a reasonable doubt.

{40} Defendant observes that the instructions he proposed were based on Uniform Jury Instructions proposed prior to his trial and later adopted. Defendant also emphasizes that the instructions rejected by the trial court would be required if the trial were held today. Therefore, according to Defendant, the instructions given to the jury are invalid under *Parish.*

{41} Although it is true that Defendant's proposed instructions are in conformity with currently required uniform instructions, *see* UJI 14–5110 NMRA 1998, we believe the instructions given to this jury clearly indicated that the State had to prove to the jury's satisfaction beyond a reasonable doubt that Defendant was capable of forming the deliberate intent to take the life of another when he killed Jim. Accordingly, they were not at odds with *Parish,* 118 N.M. at 45–46, 878 P.2d at 994–95 (requiring instructions that clearly place burden on State to disprove defense beyond reasonable doubt).

{42} Nor are we troubled by the reference to "if any" in the first-degree murder instruction. This reference does not convey a belief by the trial court that Defendant did not use alcohol and/or methamphetamine on the night of Jim's death. To the contrary, it suggests only that the State had no burden regarding Defendant's claimed use of alcohol and methamphetamine. It must prove only that Defendant had the capacity to form the deliberate intent to kill another in spite of any intoxicants Defendant might have consumed prior to the killing. We fail to per-

ceive how Defendant was prejudiced by the trial court's expression of neutrality with respect to Defendant's drug and alcohol use that night.

### E.  SUFFICIENCY OF EVIDENCE OF PREMEDITATION.

{43}  At the close of the State's case, Defendant moved for a directed verdict on the grounds that there was insufficient evidence on the element of premeditation. The trial court denied the motion, saying there was a view of the evidence supporting the inference that Defendant killed with deliberate intention to take away the life of another.

{44}  Defendant contends "there was no reasonable view of the evidence from which to infer [he] wanted to find someone to kill ." He maintains that Kinlacheeny's testimony that Defendant had made statements about wanting "to pull a fatality" and Caboni's testimony that Defendant said he wanted to "shank" someone did not suffice to support, beyond a reasonable doubt, an inference that he deliberately intended to kill. Defendant argues, moreover, that he was drunk while making these statements. The State argues that the evidence of a plan to kill was overwhelming.

{45}  As we review the evidence, we view it "in the light most favorable to supporting the verdict and resolve all conflicts and indulge all permissible inferences in favor of upholding the verdict." *State v. Apodaca,* 118 N.M. 762, 766, 887 P.2d 756, 760 (1994). Considered in this light, the record shows Defendant spoke frequently of "pulling a fatality." He spent much of that evening talking about looking for someone to "shank," beat up, jump, or do in. He was carrying a knife. He stabbed Jim eight times with his knife, and when Jim had keeled over, he kicked him. He threatened one or more of his friends with retaliation if they reported the crime. The next day he told Caboni he had stabbed Jim eight times, the precise number of stab wounds found in Jim's body. The jury could reasonably conclude from this evidence that Defendant formed a deliberate intent to kill in spite of

the alcohol and/or methamphetamine he consumed earlier that evening.

{46}  Defendant analogizes to *State v. Garcia,* 114 N.M. 269, 837 P.2d 862 (1992), in which we reversed a first-degree murder conviction because the evidence did not indicate that the defendant had intended to kill the victim, despite the fact that he intended to fight with the victim. In *Garcia* there was *no* evidence to support the inference that the defendant formed the deliberate intent to kill, as defined by the jury instructions. *Id.* at 275, 837 P.2d at 868. Rather the evidence was consistent with a rash and impulsive killing. *Id.* Here, in contrast, there was ample evidence that Defendant handpicked Jim because he was extremely drunk and was or would be unable to understand or appreciate the dangers posed to him by the Defendant, such as pulling "a fatality." Therefore, we find no merit in Defendant's assertion that the evidence was insufficient to support his conviction.

### F.  CUMULATIVE ERROR.

{47}  Finally, we consider Defendant's claim that the trial court's numerous errors, when viewed cumulatively, require reversal of his conviction, even if none of these errors individually warrants reversal. We will reverse a conviction "when the cumulative impact of the errors [that] occurred at trial was so prejudicial that the defendant was deprived of a fair trial." *State v. Baca,* 120 N.M. 383, 392–93, 902 P.2d 65, 74–75 (1995) (quoting *State v. Martin,* 101 N.M. 595, 601, 686 P.2d 937, 943 (1984))(alteration in original).

{48}  As discussed above, we believe the jury was properly instructed, there was sufficient evidence to support the verdict, and there was no indication that the prosecutor struck any juror for improper reasons. In these areas, we find no error. The only possible basis for applying the cumulative error doctrine to this case would be the various statements and questions regarding NATURAL BORN KILLERS and "tweaking" among long-term heavy methamphetamine users. For the reasons stated above, *see supra* Part III.B., we do not agree with Defendant's contention that these remarks

were prejudicial to Defendant. Therefore, we find no cumulative error.

## IV. CONCLUSION.

{49} For the foregoing reasons, we affirm Defendant's conviction for first-degree murder.

{50} **IT IS SO ORDERED.**

FRANCHINI, C.J., and BACA, MINZNER and SERNA, JJ., concur.

