This decision was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of non-precedential dispositions. Please also note that this electronic decision may contain computer-generated errors or other deviations from the official paper version filed by the Supreme Court.

# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Filing Date: August 4, 2016**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.                                                                        **NO. S-1-SC-34984**

**ALEXIAS TORRES,**

Defendant-Appellant.

**ORIGINAL PROCEEDING ON CERTIORARI**
**James Waylon Counts, District Judge**

Marco & Shattuck
Joseph E. Shattuck
Albuquerque, NM

for Appellant

Hector H. Balderas, Attorney General
Charles J. Gutierrez, Assistant Attorney General
Santa Fe, NM

for Appellee

**DECISION**

**VIGIL, Justice.**

{1}    Alexias Torres (Defendant) appeals her convictions of first-degree murder, contrary to NMSA 1978, Section 30-2-1(A) (1994), conspiracy to commit first-degree murder, contrary to NMSA 1978, Section 30-28-2(A) (1979), and tampering with evidence, contrary to NMSA 1978, Section 30-22-5(A) (2003). Defendant challenges her convictions on four grounds, arguing that: 1) there was insufficient evidence to support any of the three convictions; 2) the trial court abused its discretion under Rule 11-403 NMRA by admitting graphic video evidence of Victim dying, as caught by a police officer's lapel camera; 3) the trial court abused its discretion under Rule 11-404(B)(1) NMRA by admitting evidence that Defendant was carrying a handgun prior to the murder; and 4) there was ineffective assistance of counsel.

{2}    We reject each of Defendant's claims of error and affirm her convictions. We render this non-precedential decision because settled New Mexico law controls each of the issues Defendant raises. *See* Rule 12-405(B)(1) NMRA.

**I.    BACKGROUND**

{3}    On June 6, 2011, Melissa Mathis (Mathis) and Victim—who were romantic partners for six years cohabiting with one another in Alamogordo—ended their relationship. On June 7, 2011, after the breakup, Mathis asked Victim to move out of

2

her trailer and Victim went to stay at the nearby trailer of her Burger King coworker George Rader (Rader). That evening there was an angry exchange of text messages between Victim and Mathis involving cross-accusations of infidelity, cross-accusations of credit card theft, an accusation that Victim was cooperating with police regarding the aforementioned, and Victim's request to recover her possessions from Mathis's trailer. Ultimately, eight police officers would be dispatched to Mathis's trailer to end a dispute between Mathis and her landlord premised on Victim's retrieval of her possessions. After the police left, around 9:00 p.m., Mathis sent a text message to "Annette" that "Shit went down," and a text message to "Tania" "Hey girl shit went down wit [sic] me nshorty [sic] [Victim] again."

{4}     In addition to these text messages, at some point during or after these disputes, Mathis called Defendant. Defendant had stayed with Mathis and Victim for a week the month prior. Mathis testified that she wanted Defendant's help in selling a television, but she ultimately sold that television on her own. Nonetheless, Mathis—who had been drinking—paid her friend "Amy" to drive her to Defendant's home in Ruidoso. Mathis wanted Defendant's help so she could "get back on her feet" after her break-up with Victim. She also suggested Defendant find a job in Alamogordo.

3

{5}     Upon arriving at Defendant's home in Ruidoso, Mathis cried about the breakup and asked Defendant to talk with Victim on her behalf. Amy, Mathis, and Defendant then went to the home of Defendant's friend, Dave Franco, where they met Franco's nephew Jonathan Montoya. Montoya ultimately agreed to accompany the women on their trip back to Alamogordo. Franco gave Montoya a handgun, and Mathis "probably" saw Defendant in possession of a gun herself. After about an hour in Ruidoso, Defendant drove Amy, Montoya, and Mathis to a liquor store, and then Amy drove the rest of the way to Alamogordo. In Alamogordo Amy separated from the group while Defendant, Montoya, and Mathis drank a bottle of alcohol in Mathis's trailer. Amy did not testify at trial.

{6}     Defendant then drove Mathis and Montoya, in Mathis's car, to Rader's trailer to find Victim. Neither Victim nor Rader were home, so the trio instead visited Mathis's brother-in-law. Mathis and Defendant left Montoya in the car as they purchased drugs from the brother-in-law, at which point Mathis saw Defendant place either a handgun or remote control in her waistband. Defendant next drove the trio to the Burger King where both Rader and Victim worked.

{7}     Though Victim was not scheduled to work the graveyard shift between June 7 and 8, 2011, she had decided to accompany Rader to his shift because she was nervous

4

about being alone in his trailer. Plus, she was scheduled to work the morning of June 8, 2011. Also working were the manager Kiyuni Sweet (Sweet) and Rommie Rogers.

{8}     Defendant, with Montoya in the passenger seat and Mathis in the back, pulled into the Burger King parking lot around 4:00 a.m. Defendant made a U-turn in the parking lot, causing the vehicle to be parked facing White Sands Boulevard, the main road. At this point, having seen the vehicle arrive, Victim called out to Sweet for help as it approached her. Sweet observed Victim arguing with the vehicle's occupants, and heard Defendant yell something similar to "Why did you hurt my girl, [Mathis]?" Sweet heard Victim say "I love her," and then at that point he walked away toward the back of the store to retrieve a box. After leaving, Sweet heard "a pop," followed by three more in quick succession.

{9}     The "pops" were gunshots; Montoya had fired a handgun once into the car's dashboard, and three times into the pavement at Victim's feet. One of those three bullets caromed off the pavement and struck Victim harmlessly in the left thigh, and one struck Victim in the right thigh. The bullet striking Victim's right thigh severed her femoral artery.

{10}     After the shots were fired Defendant drove away quickly—but did not necessarily "tear[] out of the parking lot"—northbound on White Sands Boulevard.

5

Defendant then headed west for a half-mile before heading north onto a by-pass. At this point a police officer observed Defendant as she drove toward a rural, desolate area that is not on the way to Ruidoso or Mathis's trailer park. Defendant was then stopped and each occupant arrested. Defendant was not visibly impaired.

{11}     When police executed a search warrant on Mathis's vehicle they found the handgun hidden behind the front-center console. Four fired cartridges were found inside the casings of the handgun, and testing confirmed that the bullet found in Victim's leg was fired by the recovered handgun. While no fingerprints were lifted from the handgun, investigators did procure DNA samples. Analysis of DNA samples taken from the handgun eliminated Defendant and Mathis as contributors. Police also recovered two pairs of gloves from the front passenger seat, and at trial the State elicited testimony that the absence of fingerprints or DNA could be explained by the wearing of such gloves.

{12}     A police officer responding to the shooting at Burger King used a lapel camera to capture footage of Victim bleeding and suffering on the restaurant floor. In the video the officer describes Victim's injuries and has Victim identify those responsible for the shooting, but also shows Victim without clothing as emergency personnel work to inspect her injuries. The video was admitted into evidence and shown to the

jury twice, once during closing argument.

{13}     Following the incident Defendant claimed no memory of the murder or the events transpiring after she arrived in Alamogordo. Defendant also claimed to have no knowledge of who Victim was. Defendant was convicted of first-degree murder (willful and deliberate), conspiracy to commit first-degree murder (willful and deliberate), and tampering with evidence.

**II.     DISCUSSION**

**A.     There Was Sufficient Evidence to Support Defendant's Convictions of First-degree Murder, Conspiracy to Commit First-degree Murder, and Tampering With Evidence**

{14}     Evidence is sufficient to sustain a conviction when there exists substantial evidence of a direct or circumstantial nature "to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Flores*, 2010-NMSC-002, ¶ 2, 147 N.M. 542, 226 P.3d 641 (internal quotation marks and citation omitted). "Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *State v. Largo*, 2012-NMSC-015, ¶ 30, 278 P.3d 532 (internal quotation marks and citation omitted). A jury's verdict "should not be based on speculation, guess or conjecture." UJI 14-6006 NMRA. "In reviewing whether there was sufficient evidence to support a

7

conviction, we resolve all disputed facts in favor of the State, indulge all reasonable inferences in support of the verdict, and disregard all evidence and inferences to the contrary." *Largo*, 2012-NMSC-015, ¶ 30 (internal quotation marks and citation omitted).

### i. First-degree Murder

{15} Defendant first argues that there was insufficient evidence to support a verdict of first-degree murder under the State's theory of accomplice liability. In essence, Defendant characterizes the State's case at trial as relying on non-existing evidence; that is, the State argued that the absence of Defendant's DNA and fingerprints on the handgun shows that the accomplices must have plotted to commit murder and hide evidence, and thus because Defendant fled the scene she must be guilty. Further, Defendant argues, the jury was asked to make speculative leaps in order to infer that a plot to kill Victim had been hatched at some point between Defendant's departure from Ruidoso and the actual shooting. We conclude that there was sufficient evidence to support Defendant's conviction of first-degree murder.

{16} A defendant "may be charged with and convicted of the crime as an accessory if he procures, counsels, aids or abets in its commission" by another. NMSA 1978, Section 30-1-13 (1972).

8

> For accomplice liability, the State must show not only [that a defendant was] aiding in the commission of the killing[,] but also that the defendant intended that the underlying felony be committed and 'intended the killing to occur or knew that [he or she] was helping to create a strong probability of death or great bodily harm.'

*State v. Fry*, 2006-NMSC-001, ¶ 23, 138 N.M. 700, 126 P.3d 516 (quoting UJI 14-2821). Under the law, "a jury cannot convict a defendant on accessory liability for a crime unless the defendant intended the principal's acts." *State v. Carrasco*, 1997-NMSC-047, ¶¶ 7, 9, 124 N.M. 64, 946 P.2d 1075. Thus, the State needed to show that Defendant had the underlying deliberate intent to commit first-degree murder, and aided Montoya in so doing. *See State v. Vigil*, 2010-NMSC-003, ¶ 15, 147 N.M. 537, 226 P.3d 636 (discussing "the two separate requirements [of accomplice liability], intent by a defendant that another person commit the offense and an act on a defendant's part to cause the other person to commit it").

{17} "Murder in the first degree is the killing of one human being by another without lawful justification or excuse . . . by any kind of willful, deliberate and premeditated killing." Section 30-2-1(A)(1). " 'Deliberate intention' " is intention " 'arrived at or determined upon as a result of careful thought and the weighing of the consideration for and against the proposed course of action.' " *State v. Cunningham*, 2000-NMSC-009, ¶ 25, 128 N.M. 711, 998 P.2d 176 (quoting UJI 14-201 NMRA).

9

"Though deliberate intent requires a calculated judgment to kill, the weighing required for deliberate intent may be arrived at in a short period of time." *State v. Guerra*, 2012-NMSC-027, ¶ 28, 284 P.3d 1076 (internal quotation marks and citation omitted).

{18}    Jury Instruction No. 21 read in part that

> [the defendant . . . may be found guilty of the crime[] of First [-]Murder (Willfull and Deliberate) . . . even though she herself did not do the acts constituting the crime, if . . . 1. The defendant intended that the crime be committed; 2. The crime was committed; 3. The defendant helped, encouraged[,] or caused the crime to be committed.

{19}    Defendant does not cite any controlling caselaw to support her argument that the evidence was insufficient; instead, Defendant lays out the evidence from trial and asks this Court to judge whether a juror's inference from that evidence to a finding of deliberate intent relied on speculation. We agree with the State that the circumstantial evidence of a plot to kill Victim and the evidence that Defendant was the get-away driver and engaged in an argument with Victim at the murder scene was sufficient to support the jury's finding that Defendant was guilty of first-degree murder pursuant to a theory of accomplice liability.

{20}    Though Defendant does not primarily challenge the "help[], encourage[], or cause[]" requirement of Defendant's conviction as premised on accomplice liability, we deem that the evidence in support of as much was sufficient. In *Carrasco* this

Court concluded there was sufficient evidence to support a defendant's conviction under accessory liability for an attempted convenience store robbery where defendant drove to a store he had worked at for five months prior, parked the car where it could not be seen, waited in the car while his companions attempted the robbery, and was the get-away driver. 1997-NMSC-047, ¶¶ 10-19. As well, in *State v. Lucero*, this Court deemed evidence of accomplice liability sufficient where a defendant was "the driver of the car, kept the motor running, saw what occurred and drove the get-away car." 1957-NMSC-062, ¶ 4, 63 N.M. 80, 313 P.2d 1052.

{21} Defendant primarily argues that the finding of her deliberate intent by the jury was speculative because the evidence presented at trial was sufficient only to support a finding that Montoya acted unilaterally, and not that a plot to kill Victim had been made amongst the other persons in the car. "Deliberate intent may be inferred from the particular circumstances of killing as proved by the State through the presentation of physical evidence." *State v. Duran*, 2006-NMSC-035, ¶ 8, 140 N.M. 94, 140 P.3d 515. "Intent is subjective and is almost always inferred from other facts in the case, as it is rarely established by direct evidence." *State v. Sosa*, 2000-NMSC-036, ¶ 9, 129 N.M. 767, 14 P.3d 32. Substantial evidence of deliberation can include "earlier confrontation[s] . . . or other common areas of friction leading to violence," *State v.*

11

*Tafoya*, 2012-NMSC-030, ¶ 52, 285 P.3d 604, as well as evidence of a defendant's motive to kill a victim, *State v Smith,* 2016-NMSC-007, ¶ 20, 367 P.3d 420 (collecting cases, and finding deliberate intent in part where the defendant had a motive to kill the victim, his former girlfriend). It can also include fleeing the scene, disposing of evidence, or concocting false alibis. *Flores*, 2010-NMSC-002, ¶ 22.

{22}     In support of the finding of deliberate intent the State points to the direct evidence of a motive to kill Victim, and the circumstantial evidence of a "plot" to kill Victim. From the content of her text messages, Mathis seemingly hit a boiling point in her relationship right before Victim and Mathis's landlord attempted to retrieve some of Victim's possessions from Mathis's trailer. Then, soon thereafter, she called Defendant and traveled to Ruidoso where she was emotional and told Defendant about the breakup. Next, Defendant and Mathis met up with Montoya, who Mathis saw was in possession of a handgun. They then returned to Alamogordo and sought out Victim. After failing to find Victim at Rader's trailer, they went to her place of work. First, though, they stopped to purchase drugs and Mathis may have seen that Defendant herself was also in possession of a handgun. Upon arriving at the Burger King, Defendant made a U-turn in the parking lot so the vehicle was positioned such that a major road could be quickly and easily accessed. Defendant then argued with Victim,

12

inquiring why Victim had hurt Mathis. And, two pairs of gloves were recovered from the passenger seat. The shooting took place in June, which is relevant because as in *State v. Durante* the Court of Appeals determined that defendant's use of a ski mask in July supported an intent to commit aggravated assault because there was no other explanation for having the mask in July. 1986-NMCA-024, ¶ 15, 104 N.M. 639, 725 P.2d 839. From this evidence the jury inferred that Defendant had plotted to kill Victim with deliberate intent.

{23}    The evidence of the circumstances surrounding Defendant's presence in the car at that specific Burger King supports the jury's inference that Defendant had a deliberate intent to kill Victim. *See Carrasco*, 1997-NMSC-047, ¶¶ 12-13 (concluding that a reasonable jury could infer deliberate intent from a defendant's involvement in robbery as a getaway driver); *see also State v. Salazar*, 1997-NMSC-044, ¶¶ 4, 46, 123 N.M. 778, 945 P.2d 996 (concluding that evidence of the victim and defendant's troubled relationship history supported inference of motive and deliberate intent, and that pursuit of victim also supported deliberate intent); *cf. State v. Begay*, 1998-NMSC-029, ¶ 45, 125 N.M. 541, 964 P.2d 102 (carrying a knife throughout the evening supported inference of deliberate intent). The jury was free to reject Defendant's version of the facts, which suggested unilateral and unsolicited conduct

on the part of Montoya, and it apparently did so. *See State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829 ("Contrary evidence supporting acquittal does not provide a basis for reversal because the jury is free to reject [the d]efendant's version of the facts.").

{24}   Defendant's post-murder conduct further supports the inference of deliberate intent. *See, e.g.*, *Flores*, 2010-NMSC-002, ¶ 23 (providing that "evidence of flight or an attempt to deceive the police may prove consciousness of guilt" (internal quotation marks and citation omitted)). After the shooting Defendant drove quickly and evasively from the scene of the crime. There was also testimony that the driver of the car did not peel off as though she had been spooked or surprised by Montoya's conduct. As well, the murder weapon was stashed inconspicuously in the vehicle's center console. Further, Defendant was less than forthcoming during her interviews with police, claiming she had no memory of the events that unfolded upon her arrival in Alamogordo and that she had no knowledge of Victim's identity. Such evidence of fleeing, hiding evidence, and deceiving investigators is sufficient to support a jury's verdict of first-degree murder under *Flores* since such evidence establishes consciousness of guilt and supports an inference of deliberate intent. 2010-NMSC-002, ¶ 23. As such, we conclude that there was sufficient evidence to support

14

Defendant's conviction of first-degree murder, and affirm.

**ii.      Conspiracy to commit first-degree murder**

{25}      Defendant next challenges the sufficiency of evidence in support of her conviction for conspiracy to commit first-degree murder. Defendant argues that the juror's inference that Defendant, Mathis, and Montoya plotted to kill Victim relies on speculation, as opposed to direct or circumstantial evidence.

{26}      "Conspiracy consists of knowingly combining with another for the purpose of committing a felony . . . ." Section 30-28-2(A). The agreement can be verbal or inferred from acts suggesting the conspirator knew of and engaged in the scheme. *State v. Trujillo*, 2002-NMSC-005, ¶ 62, 131 N.M. 709, 42 P.3d 814.

{27}      We have already concluded that there was sufficient evidence to support the jury's finding of deliberate intent. Much of the evidence that was sufficient to support the jury's finding of deliberate intent pertained to the State's presentation that there had been a plot to kill Victim, and such evidence of a plot also inherently supports the jury's inference that there was a conspiracy.

{28}      Again, as evidence of the conspiracy and of deliberate intent, the State in part points to Mathis's breakup with Victim, the post breakup phone call between Mathis and Defendant, the car ride from Ruidoso to Alamogordo, the time spent in Mathis's

15

trailer, the time spent looking for Victim at Rader's trailer, Montoya and Defendant's alleged possession of a handgun, the manner in which the car was positioned for an easy get-away upon arriving at Burger King, the manner of the get-away, and the recovery of gloves from inside the car. From this evidence the jury inferred that Defendant and the other persons in the car at the Burger King had conspired to kill Victim. We conclude that this evidence is sufficient to support Defendant's conviction of conspiracy to commit first-degree murder, and affirm.

### iii.    Tampering with evidence

{29}    Defendant next takes issue with the sufficiency of the evidence in support of her conviction for tampering with evidence. There is no direct evidence, such as Defendant's DNA or fingerprints on the recovered weapon, to suggest that Defendant, the driver of the car, hid the weapon herself. Thus, this conviction must be analyzed under the framework of accomplice liability in accordance with Jury Instruction 21, using the same standard of review we used for first-degree murder and conspiracy to commit first-degree murder. In this instance, though, Defendant is arguing that there was insufficient evidence that she "helped, encouraged[,] or caused" Montoya to hide the handgun and tamper with evidence.

{30}    Under New Mexico law, tampering with evidence is "destroying, changing,

16

hiding, placing or fabricating any physical evidence with intent to prevent the apprehension, prosecution or conviction of any person or to throw suspicion of the commission of a crime upon another." Section 30-22-5. When direct evidence of an intent to disrupt an investigation is lacking, it is often inferred from an overt act of the defendant. *Duran*, 2006-NMSC-035, ¶ 14. For example, in a case involving death by gunshot to the head, evidence that the defendant gave a gun to his brother shortly after the killing, instructed his brother to hold it, and then lied to the police about his knowledge of the gun's whereabouts was sufficient evidence of an overt act from which the jury could infer an intent to tamper with evidence. *State v. Arellano*, 1977-NMCA-126, ¶ 9, 91 N.M. 195, 572 P.2d 223. However, absent both direct evidence of a defendant's specific intent to tamper and evidence of an overt act from which the jury may infer such intent, the evidence cannot support a tampering conviction. *Duran*, 2006-NMSC-035, ¶ 15.

{31}     The State argues that the jury was free to infer that the plot to kill Victim included a contingency plan to hide the handgun after the shooting had taken place. This, it claims, is supported by evidence that Defendant "helped" Montoya by buying him time to hide the handgun in the center console by driving away from the murder scene into a deserted area. In conjunction with the evidence of a plot to kill Victim,

17

we conclude that Defendant's conduct in driving from the scene and not immediately surrendering to police "helped, encouraged[,] or caused" Montoya to hide the gun—plus, it was hidden inconspicuously in the center console between the driver and passenger seats, so she likely saw it happening. Finally, there was testimony that Mathis told Montoya to toss the handgun out the window, so a discussion concerning tampering with evidence indeed occurred as Defendant was driving. Thus, we conclude that the circumstances of the murder and tampering establish an "overt act" from which a jury could reasonably infer Defendant's specific intent for Montoya to tamper with evidence, and affirm.

**B.      Admission of Gruesome Video Evidence Was Not an Abuse of the Trial Court's Discretion Under Rule 11-403**

{32}      Defendant next argues that the admission of the police lapel cam video was unduly prejudicial and cumulative under Rule 11-403. The video depicts employees and emergency personnel attending to Victim's wounds and asking questions about her attackers. The video is a graphic actual account of Victim's bleeding and suffering, and at times Victim is unclothed while emergency personnel attend to her injuries.

{33}      Rule 11-403 states that evidence may be excluded "if its probative value is substantially outweighed by the danger of . . . unfair prejudice, confusion [of] the

18

issues or misleading the jury, [or by considerations of] undue delay, [waste of time or needless presentation of] cumulative evidence." "Because a determination of unfair prejudice is fact sensitive, much leeway is given trial judges who must fairly weigh probative value against probable dangers." *State v. Otto*, 2007-NMSC-012, ¶ 14, 141 N.M. 443, 157 P.3d 8 (alteration in original) (internal quotation marks and citation omitted). We review the admission of evidence for abuse of discretion. *See State v. Martinez*, 1999-NMSC-018, ¶ 31, 127 N.M. 207, 979 P.2d 718 ("The trial court is vested with great discretion in applying Rule [11–403], and it will not be reversed absent an abuse of that discretion.").

{34}     "An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case." *State v. Moreland*, 2008-NMSC-031, ¶ 9, 144 N.M. 192, 185 P.3d 363 (internal quotation marks and citation omitted). An abuse of discretion is a ruling that is "clearly untenable or not justified by reason." *Id.* (internal quotation marks and citation omitted). If there are reasons both for and against a court's decision, there is no abuse of discretion. *Id.* It is a defendant's burden to establish that the trial court abused its discretion. *State v. Torres*, 1999-NMSC-010, ¶ 10, 127 N.M. 20, 976 P.2d 20.

{35}     In admitting the video evidence, the trial court determined: "it is probative of

19

issues in the case . . . the jury need [not] necessarily be insulated from all the unpleasantness that a murder entails . . . there is legitimate evidentiary value to the Video over and above inflaming [the jury's] passions. . . ."

**{36}** Defendant first argues that because the prejudice *substantially* outweighed the probative value of the video the trial court was barred under *State v. Martin* from exercising its discretion to admit the video. 1984-NMSC-077, ¶ 20, 101 N.M. 595, 686 P.2d 937. *Martin*, though, is inapplicable because it involved expanding the scope of cross-examination. *Id.* ("It is within the discretion of the trial court to expand the scope of cross-examination. Inquiry into additional matters must, however, be conducted as if on direct examination. Rule *611(b) does not allow the trial court discretion* to admit evidence which is otherwise inadmissible because it is irrelevant, *or if the probative value is substantially outweighed by the danger of unfair prejudice*." (emphases added) (citations omitted)). The trial court's decision to admit the video remains within the sound discretion of the trial court.

**{37}** Defendant's next argument pertains to the cumulative effect of the video. Defendant argues the video was unnecessary given eyewitness testimony as to the nature of Victim's death. "[P]hotographs are properly admitted within the discretion of the trial court if they are corroborative of other relevant evidence adduced at the

trial, even though they may be cumulative." *State v. Ho'o*, 1982-NMCA-158, ¶ 19, 99 N.M. 140, 654 P.2d 1040 (referencing *State v. Upton*, 1955-NMSC-087, ¶ 11, 60 N.M. 205, 290 P.2d 440; *State v. Valenzuela*, 1976-NMSC-079, ¶ 8, 90 N.M. 25, 559 P.2d 402. The same is true for a corroborating video. *See State v. Hernandez*, 1993-NMSC-007, ¶ 38, 115 N.M. 6, 846 P.2d 312. Defendant also argues that replaying the video during closing arguments was cumulative. While this appears to be duplicative, the video had already been admitted into evidence, enabling the jury to watch it again at any time should they so choose. Therefore, Defendant's argument as to the cumulative impact of the video shown during the closing arguments lacks merit.

**{38}** Concluding that the video was not cumulative, we next address whether the video's content was so prejudicial that it was an abuse of discretion for the trial court to admit it over Defendant's objection. We conclude that its admission was not an abuse of discretion because it was probative of an element of the charged offense of shooting at or from a motor vehicle resulting in great bodily harm—that element being a resultant great bodily harm. And, second, a review of New Mexico case law considering the admission of gruesome photographs into evidence indicates a very high bar for demonstrating an abuse of discretion under any Rule 11-403 challenge. *See, e.g.*, *State v. Saiz*, 2008-NMSC-048, ¶¶ 52, 54, 144 N.M. 663, 191 P.3d 521

21

(holding that the trial court did not abuse its discretion by admitting five gruesome photographs of the victim's decomposed body, when those photographs aided the pathologist's testimony), *abrogated on other grounds by State v. Belanger*, 2009-NMSC-025, ¶ 36 n.1, 146 N.M. 357, 210 P.3d 783; *State v. Mora*, 1997-NMSC-060, ¶¶ 54-55, 124 N.M. 346, 950 P.2d 789 (upholding the admission of multiple autopsy photos of child victim on grounds that they were illustrative), *abrogated on other grounds by Kersey v. Hatch*, 2010-NMSC-020, ¶ 17, 148 N.M. 381, 237 P.3d 683; *State v. Perea*, 2001-NMCA-002, ¶ 22, 130 N.M. 46, 16 P.3d 1105 (holding that a potentially inflammatory photograph of a victim's slashed face was relevant and that its admission was within the discretion of the district court), *aff'd in part, vacated in part*, 2001-NMSC-026, ¶ 6, 130 N.M. 732, 31 P.3d 1006; *State v. Boeglin*, 1987-NMSC-002, ¶¶ 22-24,105 N.M. 247, 731 P.2d 943 (holding that the admission of a close-up photograph depicting gruesome neck wounds suffered by the victim was proper to "illustrate, clarify, and corroborate the testimony of witnesses"); *State v. Pettigrew*, 1993-NMCA-095, ¶¶ 9-11, 116 N.M. 135, 860 P.2d 777 (holding that photos of the battered victim were relevant to depict the extent of the victim's injuries and to illustrate a physician's testimony, and that their admission was not an abuse of discretion); *State v. Blakley*, 1977-NMCA-088, ¶ 27, 90 N.M. 744, 568 P.2d 270

(holding that admission of photograph of the victim's body was proper because it "illustrated, clarified, and corroborated the testimony of various witnesses").

**{39}** Here, the trial court carefully considered the video under Rule 11-403 and determined that it was probative of issues in the case. Further, the trial court considered the video to be low on the gruesome scale. Given the precedent in favor of admitting probative, albeit gruesome media, we conclude that there was not an abuse of the trial court's discretion on these facts and affirm.

## C.     Article II, section 24(A)(1) of the New Mexico Constitution

**{40}** Our Constitution provides that victims of certain enumerated crimes, including murder, have "the right to be treated with fairness and respect for [their] dignity and privacy throughout the criminal justice process[.]" N.M. Const. art. II, § 24(A)(1). *See also* NMSA 1978, § 31-26-2(B) (1994) ("victims of violent crimes are treated with dignity, respect and sensitivity at all stages of the criminal justice process;"). While we have already determined that admission of the video footage of Victim gravely injured and in varying states of undress was not an abuse of discretion, it remains unclear whether the district court should have redacted certain portions of the video to preserve Victim's dignity and privacy. We offer no judgment on the matter, and comment on the issue solely to remind our district courts that they are obliged, by our

23

Constitution and statutes, to consider a victim's right to privacy and to be treated with dignity when deciding whether to admit, admit in part, or exclude evidence that implicates those rights.

**D.  Admission of Evidence That Defendant May Have Had a Firearm Prior to the Shooting Was Not an Abuse of the Trial Court's Discretion Under Rule 11-404**

{**41**}    Defendant next takes issue with admission of evidence that Mathis may have seen her with a handgun in both Ruidoso and the trailer where they bought drugs. Defendant argues that admission of this uncharged other act is inherently prejudicial, and that under Rule 11-404 the jury was misled in light of its admission. Prior to trial, Defendant sought to prevent introduction of certain counts that had been severed from those related to the murder (Defendant was tried for burglary of Rader's trailer in a separate trial). The trial court denied Defendant's motion in limine in part, finding that the State could introduce evidence of the handgun possession as it was relevant to the issues in the murder case. Yet, since the trial court had severed the charge of possession of a firearm by a felon, it ruled that the State could not introduce evidence in the instant murder trial that Defendant was a felon. Defendant essentially argues possession of the handgun is irrelevant to the murder, and only shows Defendant's propensity to commit crime, because Montoya was in fact the ultimate shooter. We

24

disagree and conclude that the evidence is relevant for showing more than just propensity.

**{42}** Rule 11-404(B)(1) precludes the admission of evidence of a person's character by admission of other-act evidence to prove "that on a particular occasion the person acted in accordance with the character." Yet, evidence of a defendant's crime, wrong, or other act might still be relevant and admissible if it is offered for another purpose. Rule 11-404(B)(2) (providing, non-exhaustively, a list of permitted uses for prior bad-acts such as opportunity, intent, preparation, plan, and knowledge). The admission or exclusion of evidence is a decision within the sound discretion of the trial court. *Martinez*, 1999-NMSC-018, ¶ 31. Here we must first consider whether the State introduced evidence of Defendant's possession of a handgun for a legitimate purpose other than to show character or propensity under Rule 11-404(B)(1), and second whether the probative value was otherwise substantially outweighed by the danger of unfair prejudice under Rule 11-403. *Otto*, 2007-NMSC-012, ¶ 10.

**{43}** The State argues that its theory of the case was that Defendant possessed the actual murder weapon during the events leading up to the shooting, which is evidence of both conspiracy and deliberate intent to kill Victim. Thus, the State argues evidence of Defendant's possession of the potential murder weapon was not other-act evidence

25

and does not implicate Rule 11-404(B). We agree, but note further that even under Rule 11-404(B), admission of the handgun-possession evidence was proper for the purpose of proving Defendant's intent and knowledge of the plot to kill Victim. In other words, Defendant shared Montoya's deliberate intent to kill and had knowledge of the crime Montoya was going to commit because they had conspired and developed a plot to kill Victim; her possession of the murder weapon and knowledge of the weapon's close proximity was evidence of her awareness of, and involvement in, the plan to deliberately kill Victim. *See State v. Gaitan*, 2001-NMCA-004, ¶¶ 19-24, 130 N.M. 103, 18 P.3d 1056 (considering testimony that a defendant told a co-conspirator to get a gun at a party, and concluding it was relevant to his intent on an accomplice liability theory for a killing that occurred after the party). Because the evidence of the handgun did not go solely to Defendant's propensity to commit crime, but rather was introduced for various permissible purposes, we conclude there was no abuse of discretion by the trial court in allowing such evidence to be considered by the jury, and accordingly affirm the trial court's ruling in this regard.

**E.      Ineffective assistance of counsel**

{44}      Defendant lastly argues that there was ineffective assistance of counsel because counsel did not object to the admission of the handgun evidence, and did not call

"Amy," the person who drove Mathis to Ruidoso, to testify. As mentioned, admission of the handgun evidence was not an abuse of the trial court's discretion. Further, choosing whether to call a witness at trial or not constitutes legitimate trial strategy. We conclude there was effective assistance of counsel.

{45} In order to establish a successful claim of ineffective assistance of counsel, a defendant is required to "first demonstrate error on the part of counsel, and then show that the error resulted in prejudice." *State v. Bernal*, 2006-NMSC-050, ¶ 32, 140 N.M. 644, 146 P.3d 289. A prima facie case of ineffective assistance of counsel is made on appeal where: "(1) it appears from the record that counsel acted unreasonably; (2) the appellate court cannot think of a plausible, rational strategy or tactic to explain counsel's conduct; and (3) the actions of counsel are prejudicial." *State v. Herrera*, 2001-NMCA-073, ¶ 36, 131 N.M. 22, 33 P.3d 22 (internal quotation marks and citation omitted); *see also Bernal*, 2006-NMSC-050, ¶ 32. "[A] prima facie case is not made when a plausible, rational strategy or tactic can explain the conduct of defense counsel." *State v. Richardson*, 1992-NMCA-112, ¶ 12, 114 N.M. 725, 845 P.2d 819, *abrogated on other grounds by Allen v. LeMaster*, 2012-NMSC-001, ¶ 36, 267 P.3d 806.

{46} In this case, both of the decisions not to object to the handgun evidence and not

to call "Amy" was rational trial strategy taken by defense counsel, in part because we have concluded that the handgun evidence was admissible for proving something other than propensity, and "Amy" may not have had favorable testimony to the defense. We conclude that trial counsel was not ineffective to Defendant on this record.

## IV. CONCLUSION

{47} We affirm Defendant's convictions of first-degree murder, conspiracy to commit first-degree murder, and tampering with evidence. Further, while we have misgivings about the use of graphic media potentially implicating a victim's rights in trial, we conclude the trial court did not otherwise abuse its discretion under Rule 11-403 by admitting the instant graphic video of Victim's last moments. We also conclude that the trial court did not abuse its discretion by admitting evidence of Defendant's possession of a handgun leading up to the murder, and finally, we conclude defense counsel rendered effective assistance to Defendant.

{48} **IT IS SO ORDERED.**


_____

**BARBARA J. VIGIL, Justice**

**WE CONCUR:**

28

_____

**CHARLES W. DANIELS, Chief Justice**

_____

**PETRA JIMENEZ MAES, Justice**

_____

**EDWARD L. CHÁVEZ, Justice**

_____

**JUDITH K. NAKAMURA, Justice**

29